**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Vincent ADAMS, Robert D. Petty, Jr., Tracy T. Fitzgerald, Charmin Banks And Gregory Hayes, Defendants–Appellants.**

Nos. 96–2605, 96–2664, 96–3320, 96–3496 and 97–1539.

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1997.

Decided Sept. 24, 1997.

Rehearing Denied in No. 97–1539 Nov. 21, 1997.

Thomas P. Schneider, Joseph R. Wall (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in Nos. 96–2605, 96–3496 and 97–1539.

Joseph R. Wall (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No. 96–2664.

Rodney Cubbie, Joseph R. Wall (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee in No. 96–3320.

Nikola Kostich, Styler, Kostich, Lebell, Dobroski & McGuire, Thomas G. Wilmouth (argued), Brennan, Ramirez, Wilmouth & Sesini, Milwaukee, WI, for Vincent Adams in No. 96–2605.

Thomas G. Wilmouth (argued), Brennan, Ramirez, Wilmouth & Sesini, Milwaukee, WI, for Robert D. Petty, Jr. in No. 96–2664.

Gary Seeling (argued), Waukesha, WI, for Tracy Fitzgerald in No. 96–3320.

Michael J. Steinle (argued), Milwaukee, WI, for Charmin Banks in No. 96–3496.

Gerald P. Boyle, Jonathan C. Smith (argued), Milwaukee, WI, for Gregory Hayes in No. 97–1539.

Before BAUER, CUDAHY and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

This multi-defendant appeal challenges the convictions and sentences of five co-conspirators. The conspiracy, like so many others, was to distribute cocaine, this time in Milwaukee and Racine, Wisconsin. We address the claims of each defendant in turn, reversing in part and affirming in part.

## I. Vincent Adams

Adams was arrested after parking his car and while walking toward his residence early one morning. The police had been following him and, when he parked, they followed suit, then stopped Adams and questioned him. Adams argues that both the stop and the subsequent search were illegal. He also argues that the frisk of his body exceeded permissible limits as it included the squeezing of his pockets and was without reasonable suspicion. Adams believes that all evidence obtained as the fruit of this search was illegally obtained and should be suppressed.

Adams was convicted after he pleaded guilty to conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), according to a written plea agreement. This plea agreement was not conditional under Rule 11(a)(2), nor did it reserve any issues for purposes of appeal. Fed.R.Crim.P. 11. "[A] plea of guilty constitutes a waiver of non-jurisdictional defects occurring prior to the plea." *United States v. Robinson*, 20 F.3d 270, 273 (7th Cir.1994). This waiver includes Fourth Amendment claims. *See United States v. Markling*, 7 F.3d 1309, 1312 (7th Cir.1993). Each of Adams' claims on appeal relates to the police search accompanying his arrest. Adams has thus waived these issues and we have no

jurisdiction to hear his appeal. Adams' appeal is dismissed.

## II. Robert D. Petty, Jr.

■ Robert Petty also pleaded guilty to the conspiracy. In conjunction with that plea Petty requested a two-level downward reduction in his guideline offense level on account of his status as a "minor participant" in the conspiracy. The government opposed this request. The district court found that Petty was not deserving of a downward reduction for being a minor participant and denied the request. Petty now appeals that decision. He argues that the facts do not support the district court's conclusion and that viewed even in the light most favorable to the government, he is deserving of "minor participant" status.

Petty admits that he and his brother, Billy Petty, "worked in conjunction with Hayes in obtaining cocaine from Chicago and distributing it in the Racine area" and "had their own customer base." Petty Br. at 6 (citing Presentence Report). Petty also admits that the Presentence Report considered him to be the fourth most culpable member of the conspiracy, which had eleven or twelve members. Nevertheless, Petty compares himself to other members of the conspiracy who did receive two-level reductions for their "minor participant" status. For example, Petty points to Charmin Banks (ranked seventh), responsible for between five and fourteen kilograms of cocaine as a courier and dealer in Milwaukee, who received the adjustment. Jamaile Andino (ranked eighth) also received a two-point downward adjustment even though he worked closely with Hayes (the leader of the conspiracy) and was present at the inception of the conspiracy. Petty also compares himself to Walter Ball (ranked eleventh), who was a courier for Hayes and received the "minor participant" reduction.

The crux of Petty's argument is that the district court mistakenly looked only to Petty's involvement in his "branch" of the conspiracy rather than to his involvement in the overall conspiracy. Petty concedes that his involvement in the Racine portion of the conspiracy was more than minor. But, he argues, he lacked understanding of the scope of the larger conspiracy, he knew only four of the other participants and he was not intricately involved in the overall conspiracy. *See, e.g., United States v. Valencia,* 907 F.2d 671, 686–87 (7th Cir.1990). Petty also argues that he worked with Hayes in only one instance and that all of his other dealings with Hayes consisted merely of Hayes acting as a supplier for Petty and his brother. Finally, Petty points to the district court's finding that Petty lacked "knowledge or understanding of the scope and the structure of the conspiracy and the activities that others were engaged in who were co[-]conspirator[s]." Petty Sentencing Transcript at 40.

We review the district court's decision for clear error. *See United States v. Boatner,* 99 F.3d 831, 838 (7th Cir.1996). The district court adopted the Presentence Report (PSR) without alteration. The PSR ranked Petty fourth in culpability, with at least six people ranked as less culpable than Petty. Thus, the government argues, Petty is not "less culpable than the average participant" and the district court did not commit clear error. *United States v. Kerr,* 13 F.3d 203, 206 (7th Cir.1993). Upon review of the sentencing transcript we agree that the district court carefully considered Petty's arguments and found that it could not consider Petty a minor participant. Contrary to Petty's argument, the district court did consider Petty's involvement in the overall conspiracy, not just the Racine portion of the conspiracy. For example, the court stated

> that the minimal or minor participant situation is generally somebody who this court has found maybe as a first-time offender or has been drawn into this conspiracy in some other fashion. Now, everybody seems to agree that Ball and Johnson are in that category, but it's hard for this court to find that this defendant played a minor role when he has a record of at least two prior drug convictions and a number of other violations ... he had a business of his own, he decided to go into partnership with his brother, and that they both dealt with Mr. Hayes who was believed to be the leader.

Petty Sentencing Transcript at 40–41. The district court's decision was not clearly erroneous.

## III. Tracy T. Fitzgerald

■ Fitzgerald appeals his conviction and sentence on the grounds that he pleaded guilty to trafficking in "cocaine base" and the government proffered proof of "cocaine base," but the district court sentenced him as if he had pleaded guilty to "crack." All "cocaine base" is not "crack" and Fitzgerald may be arguing that he would not have pleaded guilty to possession of "crack" (although this is not clear). Fitzgerald makes a number of arguments including that his sentence was improper, his attorney ineffective and that he should have been allowed to withdraw his guilty plea.[1] All of his arguments turn on one issue: whether the government must prove "crack" specifically or merely "cocaine base."

At his change of plea hearing, Fitzgerald objected to the government's characterization of "cocaine base" as "crack." During the government's presentation of what it would prove if it had to go to trial, the following exchange took place:

> [Government attorney]: . . . Mr. Fitzgerald was found with nine ounces of crack cocaine on his possession on May 25th, 1995. That converts to almost over 25 kilograms of powder cocaine under the conversion. That's the first thing.
>
> Second thing is that Mr. Fitzgerald has been involved in the distribution of cocaine since at least March 1990 when we caught him in a reverse transaction with Greg Hayes at a McDonald's parking lot. We have a substantial amount of evidence naming Tracy Fitzgerald as a cocaine and crack trafficker.
>
> . . . .

> If you want to look at just this offense, the nine ounces of crack convert to over 900 ounces of powder cocaine because of the 100-to-1 ratio here.
>
> [Fitzgerald]: But that wasn't crack, it was base you know.
>
> [Government attorney]: Crack is base.
>
> [Fitzgerald]: Oh yeah?
>
> [Government attorney]: Yeah. . . .

Fitzgerald Change of Plea Transcript at 17. Later, Fitzgerald requested both a change of plea and to discharge his attorney. Fitzgerald argued to the district court that he had not understood some portions of his plea agreement, that his attorney had not adequately explained the plea agreement and that his attorney had never been willing to go to trial. The district court denied both motions. Fitzgerald appeals both decisions and his sentence. Fitzgerald's appeal is based on his argument that all cocaine base is not crack and that before the crack enhancement can be applied to his sentence, the government must prove, by a preponderance of the evidence, that he possessed crack.

The sentencing enhancement for crack in relation to that for powder cocaine, in terms of the drug weights corresponding to specified guideline levels, is on the order of 100:1. Thus, possession of one ounce of crack receives the same sentence as possession of 100 ounces of powder cocaine. The merits and politics of this differential have been extensively debated,[2] but at least for now the enhancement differential seems to be secure. But such a severe difference in punishment deserves great care in application. Until 1993, the Sentencing Guidelines did not define "cocaine base." In 1993 a definition of "cocaine base" was added, apparently in response to the interpretation that all cocaine base was to be treated as "crack" under the

---

1. Fitzgerald also attempts in his brief to "join[ ] with his co-appellants in all issues and arguments raised by his co-appellants." This strategy is insufficient. We will not address it further.

2. See, e.g., Reva Siegel, Why Equal Protection No Longer Protects: The Evolving Forms of Status–Enforcing State Action, 49 STAN. L.REV. 1111, 1139–40 (1997); see also Karen Brown, A step in the right direction: Disparity in crack, powder cocaine sentencing is too great, KANSAS CITY STAR, July 31, 1997; Laura Vozzella, Drug Sentencing Not Racist, Court Rules Fort Worth Family Loses Crack Case, FORT WORTH STAR-TELEGRAM, May 12, 1996; Joan McKinney, Bill To Increase Powder Cocaine Penalty Revealed, BATON ROUGE ADVOCATE, November 7, 1995; Howard Manly, Drug Laws for Crack, Cocaine Quite Different, HOUSTON CHRONICLE, July 31, 1994; Jill Hodges, High Court is Asked to Support Tougher "Crack Law", STAR-TRIBUNE, April 4, 1991.

guidelines and that only powder cocaine could be addressed under the more lenient sentencing schedule. *See, e.g., United States v. Rodriguez,* 980 F.2d 1375 (11th Cir.1992); *United States v. Jackson,* 968 F.2d 158 (2d Cir.1992). At least part of the definitional difficulties arose from the fact that cocaine base, in its various forms, retains exactly the same chemical structure. The definition now found in the guidelines reads thus:

"Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form.

U.S.S.G. § 2D1.1(c)(D). Fitzgerald argues that the definition of "cocaine base" in the guidelines makes it clear that only cocaine base which is *crack* should receive the 100:1 sentence enhancement for crack. This result follows because cocaine base is a more generic and inclusive term, also applied to other forms of cocaine. Further, Fitzgerald argues that his attorney was ineffective for failing to note, even when the defendant himself did, that the government had not met its burden of proof. Finally, Fitzgerald believes that he should have been permitted to withdraw his guilty plea.

■ The government argues in response that "crack" and "cocaine base" are identical for sentencing guideline purposes.[3] Apparently confident of its position, the government further indicates that it considers all of Fitzgerald's arguments to rest on this contention and declines to respond otherwise to his arguments regarding ineffective assistance of counsel or withdrawal of his guilty plea. However, we agree with Fitzgerald that the 1993 amendment to the Sentencing

Guidelines limits the sentence enhancement to cases in which the crack form of cocaine base is proved. Therefore, the government must prove that Fitzgerald possessed crack if the sentence enhancement is to be applied.

The Eleventh Circuit first considered the new definition of "cocaine base" in *United States v. Munoz–Realpe,* 21 F.3d 375 (11th Cir.1994). Munoz–Realpe pleaded guilty to importation of cocaine after he was arrested at Miami International Airport with six bottles of liquid containing cocaine base. *Id.* at 376. He argued that the liquid cocaine base should be treated as cocaine hydrochloride (cocaine powder) under the recently adopted sentencing guideline and the court agreed: "forms of cocaine base other than crack are treated as cocaine hydrochloride."[4] *Id.* at 377.

The Third Circuit has also addressed the new definition of "cocaine base," in *United States v. James,* 78 F.3d 851, 858 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 128, 136 L.Ed.2d 77 (1996), and adopted the *Munoz–Realpe* reasoning. Because the government in *James* had failed to prove by a preponderance of the evidence that the form of cocaine base James sold was crack, the court found that it was error for the district court to enhance James' sentence. *Id.* We further agree with the Third Circuit that

[g]iven the highly severe sentencing ratio of 100:1 for crack versus cocaine, James' sentence may vary dramatically depending on whether he sold crack or cocaine. We do not believe that, without more, the casual reference to crack by the Government in the colloquy with the court over [ ]the relevant quantity of cocaine base in determining James' offense level[ ] unmistakably amounted to a knowing and voluntary ad-

---

**3.** The government also argues that Fitzgerald has waived his argument by failing to object to the Presentence Report or at sentencing. Since Fitzgerald objected at the time he entered his plea we do not believe that Fitzgerald waived this argument.

**4.** The court went on to discuss whether the term "cocaine base" found in 21 U.S.C. § 960(b) (mandating a ten year minimum sentence for a person convicted of importing 50 grams or more of a mixture or substance containing cocaine

base) was amended through the amendment to the Sentencing Guidelines. The Eleventh Circuit found that it was. The Second Circuit disagreed, in *United States v. Palacio,* 4 F.3d 150 (2d Cir. 1993). *See also United States v. Jackson,* 59 F.3d 1421, 1423–24 (2d Cir.1995) (reaffirming *Palacio*), *cert. denied,* —— U.S. ——, 116 S.Ct. 1428, 134 L.Ed.2d 551 (1996). The interpretation of "cocaine base" within 21 U.S.C. § 960(b) is not at issue in the present case and we decline to express any opinion on that issue.

mission that the cocaine base constituted crack.

*Id.* at 856. This conclusion is even more applicable in the present case since Fitzgerald objected during the change of plea proceeding to the government's use of the term "crack." *See* Fitzgerald Change of Plea Transcript at 17. In contrast, the defendants in *United States v. Sloan,* 97 F.3d 1378, 1380 (11th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997), argued not that they did not sell *crack,* but that "there was no scientific definition of crack cocaine and that the sentencing scheme was too ambiguous to warrant enforcement of the heightened, cocaine base penalties." The *Sloan* argument is directly countered by the "cocaine base" definition, which distinguishes one form of cocaine base from others, regardless of their similar chemical structures.

We find the reasoning of the *Munoz–Realpe* opinion persuasive and agree with the Eleventh Circuit that under the new definition of "cocaine base" found in the guidelines only the form of "cocaine base" which is "crack" is eligible for the enhanced sentence. Thus the government must prove by a preponderance of the evidence that the defendant possessed "crack." The government did not attempt to do so in this case and therefore Fitzgerald's sentence cannot stand. Fitzgerald's case must be remanded for re-sentencing.

The government's reliance on two of our previous cases, *United States v. Booker,* 70 F.3d 488 (7th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1334, 134 L.Ed.2d 484 (1996), and *United States v. Reddrick,* 90 F.3d 1276 (7th Cir.1996), is misplaced. In *Booker* we did state that the amendment "defines 'cocaine base' as 'crack'" but we actually applied the 1990 version of the guidelines. *Booker,* 70 F.3d at 489. All of our analysis in *Booker* is directed to the meaning of "cocaine base" under the guidelines pre–1993 amendment, which contained no definition. Thus that analysis is inapplicable here. Similarly in *Reddrick* the defendant was arguing that "'cocaine' and 'cocaine base' are indistinguishable, as a matter of chemistry" and that consequently the guidelines are ambiguous. *Reddrick,* 90 F.3d at 1282. We explained in *Reddrick* that "[t]he term 'cocaine base' was intended to refer to 'crack'—a solid form of pure cocaine which is easily smoked" but we were not addressing the definition now found in the guidelines. *Id.* Neither case addressed the issue before us now and therefore neither case supports the government's position. Since there was no proof that the "crack" subcategory of "cocaine base" was involved here, application of the crack enhancement was erroneous.

■ However, Fitzgerald's right to withdraw his plea based on ineffective assistance of counsel is far less clear. The purported ineffective assistance consists of failure to argue that involvement with "crack" as opposed to "cocaine base" had not been shown. The government contends that the ineffective assistance and withdrawal of plea issues turn on the validity of a cocaine base-crack distinction. Since we have held that distinction to be valid, the government may have waived the other issues, and there is thus an argument that the guilty plea should be permitted to be withdrawn.

At the time Fitzgerald pleaded guilty the government responded tersely to his objection that he possessed cocaine base and not crack: "[c]rack is base." Fitzgerald Change of Plea Transcript at 17. When the district court later heard Fitzgerald's request to withdraw his plea, Fitzgerald's second attempt to distinguish between cocaine base and crack was again rebuffed:

The Court: Sir, didn't you tell me you were guilty of the charge?

[Fitzgerald]: I was guilty of—my understanding of what I was guilty of is being caught with nine ounces of base crack cocaine in my house.

The Court: Being what?

[Fitzgerald]: Being caught with nine ounces of base cocaine found in the house where I was living at. That was my understanding of the controlled substance. At the time I didn't even know that I was still being charged with in excess of 500 grams of powder cocaine.

The Court: We went through that, did we not? As I recall it Mr. Wall [government attorney] corrected you when you started

to dispute the difference between crack cocaine and—

Fitzgerald Motion to Withdraw Guilty Plea Hearing Transcript at 6–7. This exchange further indicates that Fitzgerald's objections to the interchangeable use of the terms "crack" and "cocaine base" were disregarded or misunderstood, and perhaps that the court and government attorney were able even to convince Fitzgerald of the correctness of their misunderstanding. Still, whether Fitzgerald is criminally liable for possession of some form of cocaine (and specifically cocaine base) does not depend on whether the stuff was proven to be crack. At his original change of plea hearing Fitzgerald admitted that he possessed nine grams of cocaine base. That admission is unaffected by the recognition that the term "cocaine base" is broader than the term "crack." Unfortunately, the government did not make this argument, choosing to stake its case entirely on its belief that "cocaine base" and "crack" are synonymous:

> Fitzgerald's third issue is that since the substance used to calculate his guidelines, was cocaine base, and not crack, he "had a fair and just reason to withdraw his plea." Since this was the sole basis of Fitzgerald's motion to withdraw his plea, and is the sole basis for his appeal of the district court's denial of that motion, Fitzgerald's appeal must fail.

Government Br. at 15. The government could have given Fitzgerald the correct and complete answer to his objection, that, *for sentencing purposes,* cocaine base is not always crack, but that, for purposes of the indictment and plea, this distinction does not directly apply. Instead, the effect, if any, on the guilty plea was not addressed. The government's assertion, "[c]rack is base," is generally correct in contexts other than sentencing. But sentencing can become important to the taking of a guilty plea if a defendant is misled to his prejudice.

In light of the general misunderstanding of the problem in the district court and of the confusing exchange between Fitzgerald and the government, and in light of the government's apparent waiver of the issue on appeal, there might be grounds to allow the withdrawal of Fitzgerald's guilty plea. But this seems an impermissible outcome when the only error was in interpreting the Sentencing Guidelines. Essentially, there is no reason why counsel's failure to object to the "crack" enhancement *in connection with sentencing,* even if it amounted to ineffective assistance, should have any effect on the validity of the guilty plea. Fitzgerald was charged with possession of "cocaine base" and he pleaded guilty to that charge. Counsel's deficiency affected only the sentence, not the validity of the conviction.

Fitzgerald *at the plea stage* protested that cocaine base was not equivalent to crack. But his guilt or innocence did not turn on whether the substance in question was described as "crack" or as "cocaine base." Even if his counsel (or the court) had advised him that all cocaine base was not crack, it is difficult to see how this information would have directly affected his decision to enter a guilty plea. Of course, sentencing information may be relevant to entry of a guilty plea if the defendant was misled *to his prejudice.* Here, however, the argument would have to be that Fitzgerald was not told that he might get a *lighter* sentence than he could have otherwise expected (because cocaine base was not proven to be crack). He has not shown how this could be prejudicial.

Possibly, a more alert lawyer would have counseled Fitzgerald to refuse to plead guilty unless the government would concede that the substance involved was *not* crack. Of course, we have no way of knowing whether the facts would support such a concession. It is true that Fitzgerald's attorney apparently was not aware of the distinction between "cocaine base" and "crack."[5] But Fitzgerald does not argue that, had he been correctly counseled, he would have insisted on going to trial if the government would *not* concede that the cocaine base involved was not crack. That omission lowers the significance of the government's apparent waiver. While the issue is confusing and may therefore be close (because of the insistence on accuracy in change of plea proceedings), we

5. Of course, we have no way of knowing whether    Fitzgerald's "cocaine base" was in fact "crack."

believe that withdrawal of the plea is not warranted and that the conviction must be affirmed.

## IV.  Charmin Banks

■ Banks, like the other defendants in this case, pleaded guilty to conspiracy. During sentencing, the district court determined that Banks was a career offender pursuant to U.S.S.G. § 4B1.1. Banks now challenges this determination on the ground that one of the relevant convictions, obtained in 1992, was actually part of the current conspiracy and could not therefore be considered a separate and distinct offense.

Banks was convicted in state court in 1992 of cocaine distribution.  The cocaine which led to the 1992 conviction was obtained from Larry Hayes, Gregory Hayes' uncle, and the cocaine was brought from Chicago to Milwaukee by Walter Ball. This is precisely the same type of transaction, involving the same people, as is involved in the conspiracy which we are presently considering.  Banks concedes that his conduct in 1992 may be taken into account as relevant conduct, under U.S.S.G. § 1B1.3, for sentencing purposes but he strongly objects to its use for purposes of career offender status.  He argues that the conduct giving rise to his 1992 conviction and the conduct giving rise to his present conviction are the "same ongoing conduct ... [with] a common scheme with a common purpose, the same accomplices and the same *modus operandi.*"  Banks Br. at 6. Further, Banks argues that the government cannot attribute to him five to fifteen kilograms of cocaine if confined to the charged time period.  He asserts that the government must go back into 1992 to calculate that quantity and thus, that the district court is allowing the government to use the 1992 conduct in different ways for purposes of relevant conduct and for career offender status.  Banks argues that this is an improper contradiction because use as relevant conduct implies that the 1992 conduct was part of the presently charged conduct while use for career offender status means that the 1992 conduct constituted a prior and distinct offense.

The government did use Banks' 1992 conviction in calculating *Gregory Hayes'* relevant conduct, but did not in calculating *Banks'* relevant conduct.  There may be no conflict in using the same conduct for different purposes for *two different defendants.* Further, unlike *United States v. Garcia,* 66 F.3d 851, 860 (7th Cir.1995), where uncharged acts were used to calculate relevant conduct, Banks' previous drug conviction was separated from the present offense by an arrest and conviction and the service of a sentence.  In other words, the previous conduct is separated from the current conduct by a (forced) cessation of the illegal conduct. Sentencing Guideline § 4A1.2(a)(2) agrees that "[p]rior sentences in unrelated cases are to be counted separately[ and p]rior sentences imposed in related cases are to be treated as one sentence."  But note 3 clarifies thus: "[p]rior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense.)." U.S.S.G. § 4A1.2(a)(2), commentary n. 3.

We have addressed a similar issue before, in *United States v. Springs,* 17 F.3d 192 (7th Cir.1994).  In *Springs* we noted that the "significance of an intervening arrest may be that 'an offender who has been arrested between his first and second offenses has perhaps demonstrated, more than one who has no intervening arrest, that he is unlikely to mend his ways.'"  *Springs,* 17 F.3d at 195 (quoting *United States v. Butler,* 970 F.2d 1017, 1025 (2d Cir.1992)).  The district court held that

it seems rather contrary to common sense that if a defendant is convicted of a drug offense and then after his release from prison goes back into a drug conspiracy, absent some proof that he conducted it while he was in prison or engaged in activities that supervised or directed or in some other way furthered the conspiracy during that period, then it seems to this court that once he was convicted then he was out of the conspiracy, and if he went back into it then he was involved in a new conspiracy

at least so far as this defendant is concerned.[6]

Banks Sentencing Transcript at 16. We find no error with the district court's conclusion and affirm Banks' sentence.

## V. Gregory Hayes

Gregory Hayes pleaded guilty to one count of conspiracy to possess with intent to distribute cocaine, three counts of possession with intent to distribute cocaine and seventeen counts of use of a telephone to facilitate the commission of a felony. He was sentenced to 336 months in prison. Hayes, before he pleaded guilty, requested the suppression of evidence obtained through two wire intercepts. This request was denied and Hayes now appeals that decision. Hayes also appeals the application of several sentencing enhancements and the district court's calculation of his relevant conduct.

### A. Wire & Electronic Intercepts

■ The government may intercept wire communications when other investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried, or appear to be too dangerous. 18 U.S.C. §§ 2510 *et seq.* Hayes believes that the affidavit submitted by the government in its application for a wiretap makes clear on its face that the wiretap was unnecessary. That affidavit lists drug transactions involving Hayes which Hayes believes would be sufficient to constitute many of the offenses with which he was ultimately charged after the wiretap. Thus, he believes the wiretaps were unnecessary and that the evidence gleaned from them should be suppressed. The district court disagreed. We will reverse the decision to admit information obtained via wiretap only if that decision was an abuse of the district court's discretion. *See United States v. Nobles,* 69 F.3d 172, 179 (7th Cir.1995).

The government subjected Hayes to two different wiretaps (more accurately, a first wiretap and a wiretap extension). The second resulted in the implanting of a "bug" into a cellular phone given to Hayes by a confidential informant. Hayes argues that even if the first wiretap was necessary, the second was not because the government had obtained sufficient information from the first. Hayes argues that this information and the presence of trusted informants (such as the one who arranged the cellular phone for Hayes) showed that the government did not need to intrude further into Hayes' privacy with the wiretaps.

■ 18 U.S.C. § 2518(1)(c) requires the government to give (1) a complete statement detailing the other investigative procedures attempted unsuccessfully or (2) a description of why other investigative techniques would be unlikely to succeed or (3) a statement why other techniques would be too dangerous, when requesting authority for a wire interception. These requirements are in the alternative and the government need only establish one of the three. *See United States v. Zambrana,* 841 F.2d 1320, 1329 (7th Cir. 1988). Having reviewed the wiretap applications, we do not believe the admission of evidence acquired through the wiretaps was an abuse of discretion. The government went beyond the recitation of "boilerplate" language to explain that interviews of those conspirators and participants known to the government would be unsuccessful in identifying the suppliers of the cocaine and in discerning the full scope of the organization. Wiretap Affidavit ¶ 77. In addition, some of the individuals known to the government were themselves under investigation and to bring them in for questioning would both alert them (and possibly others higher up in the conspiracy) or would require grants of immunity. *Id.* at ¶¶ 78–79. Other surveillance techniques, such as physical surveillance, were considered too dangerous since

---

**6.** The court went on to note that "it was [not] the intent of Congress, or for that matter the commission, to allow a defendant to come back in and join without having to fear any further involvement because of the fact that he once was a part of that conspiracy and, therefore, is just an ongoing course of conduct.... [D]efendants do have a tendency in some cases at least to go back into the same course of conduct, and that I suspect is why the career criminal statute was enacted by Congress, ... because of the high recidivism that is involved." Banks Sentencing Transcript at 16–17.

Hayes was known to engage in anti-surveillance techniques such as excessively fast driving which could endanger third parties. The government also expressed concern that physical surveillance could result in its detection by Hayes. This could lead to a more cautious undertaking by Hayes of the illegal activities or to threats to the safety of informants without any likelihood of additional information. *Id.* at ¶ 81. In sum, the government here was investigating a large organization of drug traffickers with Hayes at the core. Perhaps if Hayes had been the only subject of the investigation the wiretaps would have been unnecessary. He was not, however, and we find the grant of the wiretaps and the admission of the evidence secured by them to have been within the district court's discretion.

### B. Relevant Conduct

■■■■■ "Relevant conduct, in a narcotics case, includes all . . . acts and omissions that were part of the same course of conduct." *United States v. Garcia,* 66 F.3d 851, 859 (7th Cir.1995). The government may prove relevant conduct under more relaxed rules of evidence, including the admission of hearsay evidence. *See United States v. Crockett,* 82 F.3d 722, 727 (7th Cir.1996). And proof need be made by a preponderance of the evidence only. *See United States v. Walls,* 80 F.3d 238, 241 (7th Cir.1996). We review the district court's determination of Hayes' relevant conduct for clear error.

■■■ Hayes argues that the district court accepted unreliable testimony and attributed amounts of cocaine to him in error. After examination of the lengthy sentencing transcript we find no clear error. The district court conscientiously accepted and rejected testimony and amounts according to whether the amounts were sufficiently connected to Hayes and whether the witness was sufficiently reliable. Further, when the court had established that Hayes was responsible for at least sixty kilograms of cocaine the court declined to examine the remainder of the witnesses, giving as his reason that "the cutoff is at 50 kilos [for sentencing purposes]." Hayes Sentencing Transcript at 677. Thus, the court conservatively estimated Hayes' relevant conduct at sixty kilograms of cocaine.

### C. Weapon Enhancement

■■■ Hayes received a two-level weapon enhancement under U.S.S.G. § 2D1.1(b)(1) which he now challenges. U.S.S.G. § 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase [the offense level] by 2 levels." Hayes argues that for the enhancement to apply, the government should be required to prove that the weapon was present at the scene of a drug transaction. This requirement, he argues, would fulfill the guidelines' intent to recognize the increased risk when a gun is involved in drug trafficking activity while at the same time not creating a blanket enhancement for mere possession of a weapon. Because the guns attributed to Hayes were found in Hayes' residence and car and in Hayes' sister's residence but were not linked to any specific drug trafficking incident, Hayes believes the enhancement was erroneously applied. Hayes further argues that the gun found in his car was more likely placed there by someone else because (1) it was not recovered until after he was incarcerated and (2) it looked clean and recently placed. He objects to the rifles found in his sister's home being attributed to him because other items found in his sister's residence were attributed to her.

■■■ We will reverse the district court's enhancement for possession of a weapon only if we find clear error. *See United States v. Anderson,* 61 F.3d 1290, 1303 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995). We find no such error here. U.S.S.G. § 2D1.1(b)(1) establishes a two-level enhancement "[i]f a dangerous weapon (including a firearm) was present." The Commentary indicates that the "adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected to the offense." U.S.S.G. § 2D1.1, Commentary n. 3. Hence, the government is not required to show that the weapon was present during a specific drug trafficking offense. The requirement is only that the

weapon was possessed during any relevant conduct. *See Anderson,* 61 F.3d at 1303–04.

 The fact that the weapons were not seized from Hayes' hands also makes no difference with regard to Hayes' responsibility for them. The guidelines do not require actual possession, but also apply to constructive possession. *See United States v. Covarrubias,* 65 F.3d 1362, 1371 (7th Cir.1995). Further, guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug trafficking enterprise. *See United States v. Ewing,* 979 F.2d 1234, 1238 (7th Cir.1992). The gun found in Hayes' car was found in the same compartment inside the engine where cocaine was transported. The guns (assault rifles) found in Hayes' sister's residence were identified as the same rifles discussed in the recording of a phone tap involving Hayes and Steve Jones (who also testified that they belonged to Hayes). The evidence presented showed that Hayes wanted Jones to teach him how to use the rifles. Thus, even though these weapons were found in Hayes' sister's residence, they were sufficiently linked to Hayes. We find the evidence sufficient to support the weapons enhancement of Hayes' sentence.

### D. Organizer Enhancement

 Under U.S.S.G. § 3B1.1, a defendant will have his offense level increased by four levels if he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The district court found that Hayes was the leader and organizer of at least seven other participants. We will reverse only upon a finding of clear error. *See United States v. Salinas,* 62 F.3d 855, 861 (7th Cir.1995). Several participants testified that they worked for Hayes and took orders from him. Other participants testified to observing Hayes give orders and directions to other members of the organization. It was shown that Hayes directed the Pettys with respect to prices and weights and quantities of cocaine to sell. Hayes even organized his girlfriend, getting her to purchase a car in her name, which he used in his cocaine business. Further, the government's wiretap expert testified that he never heard Hayes receive directions or orders from any other member of the conspiracy, but only heard Hayes issuing directions and orders. We find no clear error.

Adams' appeal is DISMISSED for lack of jurisdiction. The convictions and sentences of Petty, Banks and Hayes are AFFIRMED. The conviction of Fitzgerald is AFFIRMED; Fitzgerald's sentence is VACATED and REMANDED for further proceedings not inconsistent with this opinion.