In the

# United States Court of Appeals
### For the Seventh Circuit

Nos.  00-1482, 00-2650, 00-2957, 00-3058, 00-3371, 00-3373,
00-3374, 00-3375, 00-3376, 00-3377, 00-3401, 00-3446,
01-2890 & 01-4252

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARVIN DUMES, DERRICK OUTLAW, TOMMY JACKSON,
TERONE JOHNSON, BENNIE T. HOUSTON, JOSEPH R.
HENDERSON, LYNN EDWARD GRAVES, DAVID L. BENNETT,
MARLON E. McREYNOLDS, ROBERT O. WILLIAMS, JAMIE
L. THOMAS, JOSEPH PALMER, and BYRON K. KINCHELOW,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
Nos. IP 99-59-CR-02, -03, -04, -05, -06, -08, -09, -10,
-15, -17, -19-M/F and IP 99-74-CR-M/F—
**Larry J. McKinney**, *Chief Judge.*

ARGUED SEPTEMBER 4, 2002—DECIDED NOVEMBER 15, 2002

Before BAUER, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.*  Thirteen defendants are before
us in appeals[1] that grow out of a 1999 superseding indict-

---

[1]  The appeals, except for appeal No. 00-3374 which was submit-
ted on the briefs, were presented to us in two separate oral argu-
ments on September 4, 2002. We have consolidated the cases
in this opinion.

ment charging 22 defendants with conspiracy to possess with intent to distribute cocaine and cocaine base and with distribution of those drugs in quantities in excess of five kilograms, in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition, there were several substantive counts of drug trafficking and weapons violations. Defendant Lynn Graves' case was severed because of his health problems. Eleven of those charged entered guilty pleas and eight were convicted after a 7-week jury trial. Byron Kinchelow was charged in a separate indictment and entered a guilty plea.

One of the major contentions in the appeals is that the evidence obtained from wiretaps, as well as searches of various residences, should have been suppressed. Other issues raised include whether 21 U.S.C. § 841(b) is constitutional; whether the evidence was sufficient to convict certain of the defendants of conspiracy; whether certain defendants should have been allowed to withdraw guilty pleas for various reasons; whether certain defendants were sentenced in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and whether other errors were committed at sentencings. Tyrone Johnson's counsel filed a brief pursuant to *Anders v. California*, 360 U.S. 738 (1967).

The investigation of this case began in 1998 in the Brightwood neighborhood of Indianapolis, Indiana. Brightwood is a large urban neighborhood identified as one of the most drug-infested and dangerous areas of the city. Confidential informants provided information and made controlled buys of crack from defendant Bennie Houston. Pen registers and trap and trace devices were installed on Houston's telephone and on telephones of other persons identified by the informants. The telephone records revealed a series of frequent, brief conversations among Houston, Lee Williams, Robert Williams, Marlon McReyn-

olds, and Kelvin Marion. Special Agent Frank Fabian of the FBI believed that the men were planning and executing drug transactions. Eventually, through the wiretaps and searches, it was learned that Lee Williams and Marlon McReynolds ran a drug operation and that Joseph Palmer also distributed cocaine in Brightwood. Palmer's distribution business depended on the ability of Lee Williams and McReynolds to acquire kilogram quantities of cocaine from their supplier and to resell it to him. In turn, Williams and McReynolds depended on Palmer to purchase cocaine. In an interesting turn of events, Palmer and Williams engaged in a little price fixing—agreeing on the minimum price of cocaine in the neighborhood. Other defendants were also shown to have distributed cocaine for the conspiracy and to have assisted in processing powder cocaine into crack.

The evidence against the defendants came primarily from six court-ordered wiretaps. 18 U.S.C. § 2518. The first was a 30-day order, on December 4, 1998, for Houston's cellular phone. A 30-day order entered January 14, 1999, and extended for two 30-day periods (on February 12 and March 17, 1999) was entered for Lee Williams' cellular and residential phones. Finally, a 30-day order on February 4, 1999, extended for 30 days on March 5, 1999, was ordered for McReynolds' cellular and residential phones.

Section 2518 requires that each application for an interception of a wire, oral, or electronic communication include, among other things:

> a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

Defendants Houston, Joseph Henderson, McReynolds, Robert Williams, Jamie Thomas, and Palmer contend that the applications did not establish the necessity for the wiretaps. The argument begins with an attempt to convince us to change the standard of review on the issue of necessity. Defendants urge that *Ornelas v. United States*, 517 U.S. 690 (1996), lends support to their claim that our review should be *de novo*, rather than deferential. We could stop here: it is well-established, both before and after the decision in *Ornelas*, that the standard of review we apply on the issue of necessity is abuse of discretion. This is clear, for instance, from *United States v. Zambrana*, 841 F.2d 1320 (7th Cir. 1988), through *United States v. Adams*, 125 F.3d 586 (7th Cir. 1997), all the way to our very recent decision in *United States v. Ceballos*, 2002 WL 1968309 (7th Cir. 2002). Even though the principle is well-established, the vigor with which it is attacked in the present case perhaps justifies our giving the issue additional attention.

In *Ornelas*, the Court considered the proper standard of review of findings that an investigatory stop was supported by reasonable suspicion and that a warrantless search of a car is supported by probable cause. Independent review was said to be necessary so appellate courts could "maintain control of, and . . . clarify, the legal principles." It would, the Court said, "unify precedent." At 697. Nevertheless, the Court said, "[W]e hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." At 699.

As we see it, the problem the defendants have with convincing us to change the standard of review on the necessity issue is that the requirements for establishing

necessity are far less complex than the issues of reasonable suspicion or probable cause. In some sense, defendants' problem is not with the standard of review, but with the legal standard set out in our cases. We said in *Zambrana* that we will affirm a district court's finding that normal investigative procedures are not likely to be successful as long as there was "a factual predicate in the affidavit." At 1330. In *United States v. Farmer*, 924 F.2d 647, 652 (1991), we said that the "government's burden of proving 'necessity' is not high." In *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991), we pointed out that the statute does not require "that other investigative procedures actually be implemented before an order may be issued for the interception of wire communications, but only that the success of other methods of investigation appear unlikely." Again in *Ceballos*, we stated that the government's burden is not high. We found necessity in *Zambrana* based on evidence that informants and undercover agents could not infiltrate the conspiracy in order to establish evidence to support a prosecution and in *Adams* because the application stated that physical surveillance might alert the subject to the fact that an investigation was in progress.

Given the nature of the inquiry into necessity, we are not convinced that the standard of review, which we have used for many years, should be changed. Having said that, in this case we find it clear under any standard of review that the government has made an adequate showing of necessity.

The affidavit in support of the December 4 wiretap on Houston's cellular phone set out the efforts made to use traditional methods of investigation. Physical surveillance had been conducted almost exclusively with an FBI aircraft and a minimal number of ground vehicles to

avoid detection. Although physical surveillance had some value, the agents were not successful in gathering sufficient evidence of the drug storage locations, of quantities of drugs, and of the source of supply. Increased physical surveillance was also thought to increase the risk that the investigation would be noticed by the targets. The Brightwood section of Indianapolis is a 60-square-block area in which the alleged dealers are well-known. Outsiders, such as agents conducting surveillance, would be spotted. The affidavit also stated the obvious—that the use of interviews or grand jury subpoenas of alleged conspirators or their associates would tip them off. Search warrants had failed to reveal the source of supply. Additionally, the affidavit explained the difficulty that confidential informants and undercover agents had in trying to infiltrate the organization, largely because of the close-knit nature of the group. The limitations of other traditional methods, such as telephone toll records and pen registers, were also set out.

The January 14 application was more extensive in describing the less than fully successful investigatory activities which had been used. The affidavit pointed out that the December 4 wiretap itself failed because the targeted cellular phone was disconnected. Again, the February 4 affidavit led the judge to conclude that the wiretaps to that point had not revealed sources of supply, methods of money storage, or laundering. Also, one of the two informants had quit, cutting down the traditional methods of investigation which were possible. On February 12, the judge noted that the wiretaps had failed to disclose the methods and timing of delivery of drugs, the method of storing the proceeds, or laundering the profits. Traditional methods of investigation were not succeeding in securing evidence or penetrating the

organization. By the time of the affidavits of March 5 and 17, there had been interviews of an associate of the conspiracy and the execution of a search warrant. The court found that these techniques accomplished very little. The government's showing of necessity, we think, was sufficient.

Defendants Palmer and Jamie Thomas contend that the affidavit in support of the December 4 wiretap application did not establish probable cause to believe the telephone was being used to facilitate unlawful drug transactions. This is an issue we review *de novo*, pursuant to *Ornelas*. Our review of the affidavit, however, leads to our independent conclusion that probable cause existed. A confidential informant made controlled purchases of cocaine from Houston in the fall of 1998. Houston used the cellular phone to arrange the purchases, as well as for other discussions relating to drug sales.

Palmer and Thomas also contend that the government did not properly minimize intercepted phone conversations. The argument is based on the statistic that only 16 percent of the intercepted calls were minimized. This argument is also unavailing.

Section 2518(5) requires that wiretapping be conducted "in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." *Scott v. United States*, 436 U.S. 128 (1978), established that in evaluating whether the government had properly minimized interceptions, the courts should proceed in a realistic, commonsense fashion and not blindly rely on "the percentage of nonpertinent calls intercepted." At 140. The percentages may provide assistance, but there may be circumstances which make the interceptions reasonable. For instance, the calls may have been very short. Others

may have been one-time only calls. Some may have been ambiguous or have involved coded language. Also, interceptions which might be unreasonable later on may be reasonable at the onset of an investigation. How widespread the conspiracy is may also play a part in the analysis.

Following *Scott*, some courts have held that calls of less than 2 minutes do not require minimization. *See United States v. Malekzadeh*, 855 F.2d 1492 (11th Cir. 1988); *United States v. Apodaca*, 820 F.2d 348 (10th Cir. 1987). We certainly agree that minimization of short calls is not required. The defendants did not exclude shorter calls from their analysis. Their statistics are therefore not particularly helpful. Also, they did not attempt to analyze the number of nonpertinent longer calls which were not minimized, nor do they point to any particular conversation that should have been minimized but was not. The government's minimization efforts have not been shown to have been unreasonable.

Traditional investigative techniques also come under fire in this appeal. Joseph Henderson, David Bennett, and Byron Kinchelow contend that the searches of their residences were not supported by probable cause, that the no-knock provisions in the search warrants were not justified, and that the good-faith exception (to the exclusionary rule) does not apply. Henderson also contests the warrantless search of his vehicle. The warrants for Henderson's and Kinchelow's residences were issued by Magistrate Judge Kennard P. Foster, and the warrant for Bennett's residence was issued by a Marion County superior court commissioner. Here, under *Ornelas*, we review the issue *de novo*. We start with a few bedrock principles.

Probable cause exists when, given all the circumstances, there is "a fair probability that contraband or evidence of

a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Affidavits in support of a warrant must be interpreted in a commonsense way. *Gates*. There must, however, be a "substantial basis for determining the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 915 (1984). Next, given the proper circumstances, no-knock search warrant authorizations are permissible under federal law. *Richards v. Wisconsin*, 520 U.S. 385 (1997). If evidence is obtained pursuant to a search warrant unsupported by probable cause, it is nevertheless only suppressed where the magistrate abandoned his detached and neutral role, or where the officers seeking the warrant were dishonest or reckless in preparing the affidavit in support of the warrant, or where those officers could not have had an objectively reasonable belief in the existence of probable cause. *Leon*.

We find that suppression of the evidence is not required. As to probable cause, in support of the warrant for Henderson's residence, the affiant stated that he had listened to several hundred hours of recorded conversations and therefore knew that the members of the conspiracy were "cooking" crack cocaine. In one conversation, Henderson told Lee Williams the he was "the man" on guns. The affidavit also referred to references to Henderson's drug dealing and, lessening the possibility of mistaken identity, in one conversation Lee Williams calls Henderson by name.

Henderson contends that the warrantless search of his vehicle was unlawful. The district court found that it was lawful under the automobile exception to the warrant requirement. That conclusion is clearly bolstered by the fact that over 62 grams of crack, almost 4 grams of cocaine hydrochloride, and over $5,000 in currency were seized in Henderson's house, and he had been ob-

served using his vehicle while engaging in criminal activity. We also note in passing that the search of the vehicle yielded only a digital scale and one document, and this scant discovery turned out to be the least of Henderson's worries.

The information in support of the warrant on Kinchelow's residence came from an informant. It was detailed and accurate information, sufficient to support the warrant. *United States v. Navarro*, 90 F.3d 1245 (7th Cir. 1996). Also, three intercepted telephone calls were cited. In one conversation, Kinchelow telephoned McReynolds and told him he cooked a kilogram of cocaine. In another conversation, Lee Williams and Kinchelow discuss what would be an acceptable price for drugs. Similarly, the application for the warrant to search Bennett's residence contained probable cause. An informant personally observed drugs being distributed from Bennett's residence. The informant had also overheard someone say he had to take powder cocaine to Bennett's house to "cook" the drugs.

We also find the no-knock provisions acceptable under the particular circumstances of the case. Bennett had been arrested and convicted for several prior crimes involving firearms. Drug dealers use weapons to protect their contraband, and there was the possibility that evidence would be destroyed. As to Henderson, there was the conversation mentioned above in which Henderson also said he would be transporting a gun to another person. Henderson said he was in charge of the guns for the conspiracy. Similarly, Kinchelow was known to be an experienced dealer with a large quantity of drugs in his possession and with the incentive to protect them.

Even were we not convinced that the warrants were supported by probable cause, we would be compelled,

pursuant to *Leon*, to find that the officers relied on them in good faith. There is nothing to indicate that the issuing judicial officers abandoned their roles as neutral and detached decisionmakers, and we cannot find that the applications for the warrants were recklessly presented.

We turn now to other issues. Houston, Palmer, and Thomas think the evidence was insufficient to support a verdict that they are members of the conspiracy. We review the sufficiency of the evidence in the light most favorable to the government and uphold the jury's decision if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Albarran*, 233 F.3d 972 (7th Cir. 2000). To prove a conspiracy to possess and distribute cocaine, the government must prove that two or more people agreed to commit the unlawful act and that the particular defendant knowingly and intentionally joined in the agreement. No overt act need be charged or proven, and guilt may be inferred by the circumstances and the conduct of the parties. *United States v. Shabani*, 513 U.S. 10 (1994); *United States v. Gardner*, 238 F.3d 878 (7th Cir. 2001). We have no trouble concluding that the evidence presented here met—and indeed exceeded—this standard.

Houston negotiated the price he would pay for cocaine according to the price he knew Lee Williams would pay him. He allowed the members of the conspiracy to use his residence to cook cocaine into crack. One coconspirator, who pled guilty, observed more than a kilogram of cocaine in Houston's kitchen at a time when Palmer and Thomas dropped in. He also observed McReynolds cook cocaine into crack in Houston's house. McReynolds fronted drugs to Houston to sell.

The evidence shows that Palmer distributed cocaine and cocaine base in Brightwood for the conspiracy. His success depended on the ability of Lee Williams and McReynolds to obtain kilogram quantities of cocaine. Williams and McReynolds, in turn, depended on Palmer to purchase the cocaine. In fact, before McReynolds ordered cocaine from his supplier, he checked to see how much Palmer wanted. Often cocaine was advanced to Palmer on credit.

Similarly, McReynolds fronted cocaine to Thomas. Williams and McReynolds discussed the money Thomas owed them for fronted cocaine. At one point, when Thomas' payment was short, McReynolds allowed him to pay later. Thomas also found McReynolds an alternate source of cocaine. Another time, Thomas asked McReynolds to get a kilogram of cocaine for him for $27,000. This evidence, and more we need not recall, was sufficient to allow a reasonable jury to conclude that these men were members of the conspiracy.

Several defendants raise issues regarding guilty pleas and sentencing proceedings. Defendants Kinchelow and Tommy Jackson contend that they should have been allowed to withdraw their pleas. We review a denial of a motion to withdraw a guilty plea for an abuse of discretion. *United States v. Febus*, 218 F.3d 784 (7th Cir.), *cert. denied*, 531 U.S. 1021 (2000).

Kinchelow argues that his plea was involuntary because he did not understand the possible sentence he faced and he misunderstood his appellate rights when he pled guilty. He says that he thought he would get a 10-year sentence, and he thought he would be able to appeal his conviction. He claims that a learning disability led to his misunderstanding. We are somewhat nonplused

by this argument, given that Kinchelow received a 120-month sentence (which seems pretty much synonymous with a 10-year sentence), and he had, in fact, filed an appeal in which he raises objections to the search of his home and to the wiretap evidence. Furthermore, the record reveals that the judge conducted a proper Rule 11 colloquy, ascertaining that Kinchelow's plea was knowing and voluntary. We see no reason to conclude that the judge abused his discretion in refusing to let Kinchelow withdraw his guilty plea.

Tommy Jackson contends that he should have been allowed to withdraw his guilty plea because he did not know at that time that he was a "career offender" under the sentencing guidelines. Jackson entered his guilty plea within a few days of the start of the trial. At that time he was asked the appropriate questions to determine whether his plea was voluntary. He was clearly told that his sentence would be governed by the guidelines. And the judge warned him that he could be sentenced above the guideline range. In fact, he was told he could be sentenced up to 40 years imprisonment. Despite that warning, he says that when he entered his plea he believed that his actual sentencing range was 60 to 63 months. Then, at the time of his sentencing hearing, it became clear that he would be sentenced as a career offender, bringing his sentencing range to 188 to 235 months. At this point, after considerable discussion, he decided he wanted to withdraw his guilty plea. The hearing was adjourned while the matter was briefed. At the subsequent hearing, the judge reviewed the discussions at the original plea hearing and determined that Jackson had been warned that his sentence had not yet been calculated and would depend on guideline calculations. The motion to withdraw the plea was denied. We see no

abuse of discretion in this decision. Jackson's sentence of 188 months was well below what he was told he could receive. It was, as everyone noted at the hearings, also well below what Jackson could receive after trial, a trial at which even Jackson concedes he would almost certainly have been found guilty. We see no abuse of discretion in the denial of Jackson's motion to withdraw his plea.

Marvin Dumes also pled guilty. He entered a plea agreement in which he agreed to provide "full, complete, and truthful information and testimony." In turn, the government agreed to file, at sentencing, a statement that he had provided substantial assistance, pursuant to U.S.S.G. §5K1.1. He now complains that he should not have been sentenced without the government's providing the promised statement.

The statement wasn't provided, but the government contends its inaction was justified because Dumes breached the agreement, thus releasing the government from its obligation. What happened was that, during a debriefing, the government found Dumes uncooperative and troublesome. The debriefing ended with Dumes saying he wanted to go back to jail. Dumes then wrote a letter to the government, saying that "whatever you want me to say on the stan[d], just tell me sir and I will do it."

After receiving the letter, the government filed a motion to withdraw from the plea agreement, claiming that Dumes had breached it because his letter revealed his willingness to commit perjury. At a hearing on the matter, the government informed the court that it would not be filing a substantial assistance motion. Even after the judge warned him that without a substantial assistance motion there would be no basis for a downward departure

from the guideline sentence, Dumes wanted to proceed to plead guilty.

Dumes now argues that he should not have been sentenced without the substantial assistance motion. In effect, he says he did not breach the plea agreement; he was just having a bad day. What is clear, however, is that if Dumes had been allowed to testify and to be subjected to cross-examination, the prosecutor would also have a rather bad day. Dumes seriously undermined his value as a witness by writing that he would testify to whatever the government wanted him to say. The government was justified under these circumstances to refuse to argue that Dumes provided substantial assistance. Additionally, in determining that he wanted to proceed to plead guilty even after he was told there would be no motion regarding substantial assistance, Dumes waived the argument he is now making.

Derrick Outlaw objects to being sentenced on a base offense level of 32. That level was a result of a finding that he distributed cocaine base—or crack. He says it was simple cocaine, which carries a lighter base offense level. The basis of the finding that he was dealing crack was a wiretapped conversation between Lee Williams and Outlaw. Williams referred to Outlaw's "cooking" cocaine, which generally refers to producing crack. But Outlaw says that to him, "cooking" means "rerocking" cocaine, referring to the process of removing a portion of cocaine hydrochloride, replacing it with an adulterant, and compressing it to disguise it as a solid piece. The compressed cocaine is then sold as pure. Agent Fabian testified that everyone else referred to this latter process as "rerocking" and to manufacturing crack as "cooking." As was his prerogative, the judge believed the agent and doubted that Outlaw, alone, referred to rerocking as

cooking. We have trouble finding fault with that belief. The finding is not clearly erroneous.

A number of defendants raise sentencing issues arising out of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which was decided after the convictions but before the sentencings in this case. The defendants should be breathing a sigh of relief that, based on prior precedent, we must reject their arguments. No defendant was sentenced in excess of the statutory maximum for the crimes of which they were convicted. Remand—in which the possibility exists of increased sentences imposed consistent with *Apprendi*—is unlikely to be in their best interest.

Specifically, the defendants who make the *Apprendi* arguments are McReynolds, Palmer, Henderson, and Thomas. Remembering that the presumptive statutory maximum for the crimes committed is 20 years, we look briefly at the sentences imposed. McReynolds received 240 months on the conspiracy count and a consecutive 121-month sentence on a count charging possession with intent to deliver. Palmer received 240 months for conspiracy. Henderson received 240 months for the conspiracy and a consecutive 168 months for possession with intent to deliver. Thomas, due to an enhancement we will discuss below, received 360 months for conspiracy. The top of the guideline range for all four was life imprisonment. So it is clear that, were the cases remanded, all four men could face significantly longer sentences than they have received.

McReynolds and Henderson argue, however, that it was error to sentence them to consecutive sentences. The government responds by saying that nothing in *Apprendi* restricts the imposition of consecutive sentences, citing *United States v. Knox*, 2002 WL 745990 (7th Cir. 2002). In fact, §5G1.2(d) of the United States Sentencing Guide-

lines requires the district court to impose consecutive sentences to achieve the total guideline sentence. So the government argues, though it did not cross-appeal the issue, that McReynolds should have received 40 years (480 months), not the 361 months he received.

Because of the timing of this case, the able district judge did not apply the harmless-error analysis we have said is relevant to this situation. *Apprendi* says that facts (other than a prior conviction) that raise a defendant's sentence above the statutory maximum for the crime of conviction "must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." At 476. So *Apprendi* requires that a drug type and amount should be set out in the indictment and found by the trier of fact beyond a reasonable doubt. We have found, however, that errors in both the indictment and the charge to the jury are subject to harmless-error analysis. *United States v. Adkins*, 274 F.3d 444 (7th Cir. 2001). A judge can find it clear beyond a reasonable doubt that a properly instructed jury would have found the necessary drug quantity. As we said, the government did not cross-appeal the failure to apply harmless-error analysis, so we need not consider whether the voluminous evidence in this record would allow such a finding. All we need to decide is that the sentences were not imposed in violation of the defendants' rights, and clearly they were not.

Thomas claims he should not have been given a 2-point enhancement pursuant to U.S.S.G. §2D1.1 for use of a weapon in committing a drug trafficking crime. That argument was not raised in the district court, so our review is for plain error. *Unites States v Westmoreland*, 240 F.3d 618 (7th Cir. 2001). We see no error, plain or otherwise. During the time the conspiracy was operating, the residence Thomas used was the subject of a search warrant.

Two firearms and ammunition for those firearms were seized. Additionally, the length of Thomas' sentence was primarily a result of his having a prior drug conviction, which under *Apprendi* is not a matter which must be presented to the jury.

Lynn Graves believes that he was entitled to a reduced sentence pursuant to U.S.S.G. §5C1.2 and that the judge erred by finding that he possessed a weapon in connection with a drug trafficking offense. However, Graves was dealing drugs, and loaded weapons were found at his residence along with cocaine and over $10,000. There was no error.

There are other arguments raised which do not require discussion. We have, for instance, previously determined that 21 U.S.C. § 841(b) is, in fact, constitutional. *United States v. Martin*, 2002 WL 598557; *United States v. Brough*, 243 F.3d 1078 (7th Cir. 2001); *cert. denied*, 122 S. Ct. 203 (2001). Also, Palmer is mistaken in his belief that 3 years is the maximum term of supervised release to which he could be sentenced. It is the minimum term. *See* 21 U.S.C. § 841(b)(1)C. We also agree with counsel that Johnson has no nonfrivolous appealable issues, and thus we accept his *Anders* brief and grant his motion to withdraw.

For all of these reasons, the convictions and sentences of the defendants/appellants are AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—11-15-02