In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-3715, 01-3716, 01-3717, 01-3718,
01-4007, 01-4008, 01-4021 & 01-4095

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*
*Cross-Appellant,*

*v.*

ALFREDO CEBALLOS and ALAN MARTINEZ-GUZMAN,

*Defendants-Appellants*
*Cross-Appellees,*
and

MIGUEL A. QUINTANILLA, LEONEL MORENO, JR.,
DENEISE A. QUINTANILLA, and ABELARDO LALO-MENDOZA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 00-CR-25—**Richard L. Young**, *Judge.*

ARGUED JUNE 3, 2002—DECIDED AUGUST 27, 2002

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* This is a consolidated appeal of
the convictions and sentences of six co-defendants who were

tried by a jury and found guilty of drug conspiracy and money laundering pursuant to 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§ 1956(a)(1)(A)(i) and (h). The government also cross-appeals the sentences of two of the defendants, Alfredo Ceballos and Alan Martinez-Guzman. We affirm all of the defendants' convictions and sentences, except for Ceballos's and Martinez-Guzman's sentences, which we vacate and remand for re-sentencing.

## I.  History

In November 1999, DEA agents in southern Indiana began using an informant to make controlled sales of methamphetamine to an individual nicknamed "Cuate." The DEA monitored several purchases made by Cuate and eventually initiated surveillance on narcotics transactions perpetrated by other individuals, including defendants Martinez-Guzman and Lalo-Mendoza. As the monitored drug transactions in southern Indiana continued, DEA agents began utilizing wiretaps to record conversations between the informant and Cuate. Surveillance of these wiretaps led to an expanded investigation, implicating several more people.

On March 31, 2000, DEA agents in Evansville, Indiana received court authorization to intercept communications over two telephones and one pager belonging to Juan Manuel Mata and Lisa Caudill (the "Indiana wiretaps"). Based on numerous drug-related conversations intercepted by the Indiana wiretaps, the DEA seized one pound of methamphetamine. Subsequently, DEA agents in Dallas, Texas received court authorization to intercept communications over two telephones identified during surveillance of the Indiana wiretaps (the "Texas wiretaps"). The target telephone numbers of the Texas wiretaps belonged to defendants Miguel and Deneise Quintanilla, and during surveillance of these wiretaps, DEA agents intercepted many more drug-

related conversations. Based upon evidence of drug-related conversations obtained from the Indiana and Texas wiretaps, the seizure of the methamphetamine, and the testimony of several cooperating witnesses, the government indicted sixteen people on drug conspiracy and money laundering charges. The six defendants proceeded to trial and were convicted as charged in the indictment. The district court then sentenced the defendants as follows:

| Defendant | Charge | Sentence |
| --- | --- | --- |
| Alfredo Ceballos | Drug Conspiracy<br>Money Laundering | 360 months<br>240 months, concurrent |
| Alan Martinez-Guzman | Drug Conspiracy | 268 months |
| Miguel Angel Quintanilla | Drug Conspiracy<br>Money Laundering | Life<br>240 months, concurrent |
| Leonel Moreno, Jr. | Drug Conspiracy<br>Money Laundering | 360 months<br>240 months, concurrent |
| Deneise Ann Quintanilla | Drug Conspiracy | Life |
| Abelardo Lalo-Mendoza | Drug Conspiracy | 204 months |

## II.  Analysis

### A.  Joint Claims

#### 1.  Motion to Suppress

The defendants' first argument on appeal is that the district court erred in denying their motion to suppress evidence obtained from surveillance of the Indiana and Texas wiretaps. We will reverse a district court's decision to admit evidence obtained from wiretaps only if that decision was an abuse of discretion. *See United States v. Adams*, 125 F.3d 586, 595 (7th Cir. 1997).

The defendants first argue that the district court erred in denying their motion to suppress because, according to the defendants, the government failed to establish the necessity for wire surveillance. Federal law requires each wiretap application to contain a full and complete statement as to one of the following: (1) whether or not other investigative procedures have been tried and failed, (2) why other investigative procedures reasonably appear to be unlikely to succeed if tried, or (3) that other investigative procedures are too dangerous. *See* 18 U.S.C. § 2518(1)(c). We have previously held that "the government's burden of establishing its compliance with subsection 2518(1)(c) is not great" and should "be reviewed in a practical and commonsense fashion." *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988). In *Zambrana*, we held that the government established the necessity for wire surveillance where its wiretap application averred that normal investigative procedures would not succeed in identifying all co-conspirators at all levels of the drug conspiracy. *See id.* at 1330-32. In so doing, we noted that the government had offered a valid factual basis for this assertion: informants and undercover agents could not infiltrate the drug conspiracy to the extent necessary for a successful prosecution. *See id.* at 1331-32. In *Adams*, we held that the government had established the requisite necessity where its wiretap application stated, among other things, that physical surveillance might alert the subject to the investigation. *See* 125 F.3d at 595-96.

In this case, the government's application for the Indiana wiretaps stated that it had tried ordinary investigative procedures such as the use of informants and undercover agents, the use of telephone records and pen registers, and the use of physical surveillance, but that those procedures had been insufficient to obtain the evidence necessary to establish the full extent of the drug conspiracy and would continue to be insufficient in the future. In addition, DEA Special Agent Daniel Schmidt's affidavit provided factual

bases for this assertion. For example, it stated that inform-ants and undercover agents had been and would continue to be unable to establish contact with middle to upper-level members of the conspiracy and thus their use could not "furnish information which would fully identify all members of this ongoing criminal conspiracy or which would define the roles of these conspirators sufficiently for prosecution." Specifically, these confidential and undercover sources could not establish how the narcotics were being shipped to Indiana. In addition, the application stated that the use of telephone records and pen registers could not identify the participants in the telephone conversations or the nature or substance of those conversations. Moreover, the application stated that in Special Agent Schmidt's experience, physical surveillance would likely alert the subjects to the investi-gation. The application for the Texas wiretaps included all of the above information and was supported by an affidavit from DEA Special Agent C. Mark Styron. In addition, the Texas application stated that additional wiretaps were needed in Texas to identify some of the people discussed during conversations intercepted by the Indiana wiretaps, including people that may have supplied Miguel Quintanilla with narcotics in Texas.

As the above facts illustrate, the Indiana and Texas appli-cations provided the requisite "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried . . . ." 18 U.S.C. § 2518(1)(c). Specifically, the applications outlined numerous factual bases for the government's claim that the wiretaps were necessary to establish the full extent of the drug conspiracy. For example, as in *Zambrana*, the applications explained that informants and undercover agents had been and would continue to be unable to infiltrate the conspiracy. Fur-ther, the applications explained that telephone records and pen registers could not identify each subject's role in the

conspiracy because they could not reveal the participants in nor the substance of the conversations. Finally, as in *Adams*, the applications explained that physical surveillance would likely alert the subjects to the investigation. Therefore, we hold that the district court did not abuse its discretion in admitting evidence obtained from the wiretaps.

The defendants next contend that the applications for the Indiana and Texas wiretaps contained bad-faith misrepresentations and therefore the district court erred in denying their motion to suppress. Each application to obtain a wiretap must inform the issuing court of all previous applications for interception of wire, oral, or electronic communications involving any of the same persons specified in the pending application. *See* 18 U.S.C. § 2518(1)(e). However, a violation of the wiretap statute is not grounds for suppression unless the defendant can establish bad faith or prejudice. *See United States v. Matthews*, 213 F.3d 966, 969-70 (7th Cir. 2000). In *United States v. Zannino*, 895 F.2d 1, 8-9 (1st Cir. 1990), the defendant argued that his motion to suppress should have been granted because the government's application failed to disclose that the defendant had been the target of five previous wiretap applications. The agents making the application testified at the suppression hearing that they had conducted a thorough search of FBI files to determine whether the defendant had been the target of previous wiretap applications but that the search had come up empty. *See id.* The district court credited this testimony, and the First Circuit held that this determination was not clear error. *See id.* at 9 ("[A]n investigator cannot be expected to disclose something that he or she does not know."). Therefore, because there was no bad faith, the omission of the prior applications did not warrant suppression, even if the agents were negligent in their search. *See id.*; *see also United States v. Lujan*, 936 F.2d 406, 409 (9th Cir. 1991); *United States v. Pinelli*, 890 F.2d 1461, 1475 (10th Cir. 1989).

In the present case, the Indiana and Texas applications failed to disclose that Miguel and Deneise Quintanilla had been the targets of previous wiretap applications in Texas. However, the government agents applying for the wiretaps testified at the suppression hearing that they made three separate searches of the DEA and FBI databases and that each search failed to disclose the prior applications. In addition, Agent Styron testified that subsequent to the Texas application, he performed another search of the DEA and FBI databases and discovered that the prior applications concerning Miguel and Deneise Quintanilla had been under the names "Miquel Quintanilla" and "Deneise Scrimshire" (her maiden name). Upon learning this information, the government filed a motion with the authorizing court in Texas to amend its application for the Texas wiretap, which the court granted. The defendants offered nothing to contradict this evidence showing that the omission was inadvertent other than their conjecture that the agents must have known about the prior applications, and conjecture is insufficient to warrant relief. *See United States v. Westmoreland*, 240 F.3d 618, 637 (7th Cir. 2001). After hearing all of this evidence, the district court found that the government did not act in bad faith and therefore denied the defendants' motion to suppress. As in *Zannino*, the agents testified that they had performed searches to determine whether there had been prior applications and that these searches had come up empty. Therefore, we find that the district court did not err in denying the motion to suppress.

Finally, the defendants argue that the government did not obtain the proper approval for authorization of the Texas wiretap. Federal law provides that "any Deputy Assistant Attorney General . . . specifically designated by the Attorney General may authorize an application to a Federal judge of competent jurisdiction for . . . an order authorizing or approving the interception of wire or oral communications . . . ." 18 U.S.C. § 2516(1). Further, in Order 1950-95,

dated February 13, 1995, then Attorney General Janet Reno
"specifically designate[d] . . . any acting Deputy Assistant
Attorney General . . . to exercise the power conferred by
section 2516(1) . . . ." The Texas application contained
authorization from Mary Lee Warren, Deputy Assistant
Attorney General. The defendants apparently concede that
Mary Lee Warren signed the authorization, but argue that
"[t]he record is silent regarding who she is and what au-
thority she might possess." The defendants' assertions are
incorrect. The grant of authority clearly identifies Mary Lee
Warren as a Deputy Assistant Attorney General and there-
fore she had authority pursuant to § 2516(a) and Order
1950-95 to authorize the Texas wiretaps.

## 2. *Expert Testimony*

The defendants next contend that the district court im-
properly admitted the expert testimony of Agents Michael
Kress and Styron. Before trial, the government filed an
"Amended Notice Regarding Expert Witnesses," detailing
the agents' knowledge and experience that qualified them
as experts on drug code language. In addition, the Notice
outlined the drug code language used during approximately
forty intercepted phone conversations about which the
agents would testify. In response, the defendants filed a mo-
tion in limine, objecting that some of the pronouns outlined
in the government's Notice did not constitute drug code
language. Further, the defendants objected to the qualifica-
tion of Agents Kress and Styron as expert witnesses.

The district court denied the defendants' motion, and at
trial, over twenty recordings of intercepted phone conversa-
tions were played before the jury and admitted into evi-

dence.[1] After each recording was played, either Agent Kress or Agent Styron testified as an expert witness about the content of the conversations, including interpreting code language used to facilitate the drug conspiracy. For example, the agents testified that some of the defendants' words such as "tickets" and "cars" were code words for narcotics. Further, the agents testified that words such as "one" and "two" referred to certain quantities of methamphetamine. Finally, the agents testified that in several of the intercepted phone conversations, the defendants used simple pronouns as code language. For instance, during one phone call, Ceballos told Miguel Quintanilla that "it had come up short," and Agent Kress testified that "it" referred to a shipment of narcotics that Ceballos had received.

The defendants' first argument on appeal with respect to this testimony is that the district court erred in qualifying Agents Kress and Styron as experts. Federal Rule of Evidence 702 permits the admission of expert testimony when the specialized knowledge of the witness will aid the trier of fact in understanding the evidence or determining a fact in issue. *See United States v. Hubbard*, 61 F.3d 1261, 1274-75 (7th Cir. 1995). Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) and its progeny, the district court must act as a "gatekeeper" and determine whether the proffered expert testimony is reliable and relevant before qualifying the witness as an expert. When a challenge is made to the acceptance or rejection of expert testimony on appeal, we review whether the district court found that the testimony was reliable and relevant *de novo*. *See United States v. Allen*, 269 F.3d 842, 845 (7th Cir. 2001). If we find that the testimony was reliable and relevant, we review the

---

[1] Most of the conversations were in Spanish, but the jury was provided with transcripts of English translations.

district court's decision to admit or exclude the testimony for an abuse of discretion. *See id.*

In *Allen*, the district court qualified a DEA agent as an expert in drug trafficking primarily because the agent had received education and training in the field of narcotics trafficking. *See* 269 F.3d at 846. Specifically, the agent had worked for the DEA for thirteen years and had investigated hundreds of narcotics cases. *See id.* We then held that the district court properly qualified the agent as an expert, noting that the advisory committee notes to Rule 702 state that experience in the field can be the predominant, if not the sole, basis for expert testimony in some cases. *See Allen*, 269 F.3d at 846.

In this case, Agent Kress had worked for the DEA for approximately ten years and had investigated numerous drug-trafficking cases involving organizations from six Latin American countries. In addition, during these drug investigations, he reviewed in excess of 50,000 intercepted telephone conversations involving drug traffickers and interpreted the drug code language therein. Agent Styron had worked for the DEA for approximately thirteen years, had participated in over fifty investigations, and had testified as an expert witness on drug code language in several drug-trafficking cases. Thus, like in *Allen*, the district court properly qualified the agents as experts and did not abuse its discretion in admitting their testimony.

The defendants argue that Agents Kress and Styron did not qualify as experts because the agents based their testimony on English translations of Spanish conversations and neither spoke fluent Spanish. We can find no legal authority for the proposition that the agents' lack of fluency in the Spanish language should prohibit them from interpreting drug code language obtained from English translations of Spanish conversations. Instead, this court and other circuits have previously permitted agents to rely upon Eng-

lish translations to interpret drug code language*, see, e.g., United States v. Hughes*, 970 F.2d 227, 236 (7th Cir. 1992); *United States v. Nersesian*, 824 F.2d 1294, 1307 (2d Cir. 1987), and we see no reason to forbid this practice in the present case.

Next, the defendants assert that the district court improperly allowed Agent Kress and Agent Styron to testify regarding the defendants' use of simple pronouns during the intercepted phone conversations. We have previously held that expert testimony concerning narcotics code words is permissible because this language is not within the common understanding of most jurors. *See United States v. Rollins*, 862 F.2d 1282, 1292 (7th Cir. 1988). The government responds, therefore, that the pronouns that the agents interpreted constituted drug code language because of their ambiguity and were the proper subjects of expert testimony. For example, during one intercepted conversation that was played for the jury, Ceballos called Miguel Quintanilla, and the following conversation took place:

> Ceballos: Oh, man, one more thing . . . that guy owes me, man.

> Quintanilla:  How's that?

> Ceballos: Yeah, man. I don't know how, man, there was some missing from both.

> Quintanilla:  But I, I prepared them here, man.

> Ceballos: It really bugs me, the same as the one before, you know, like the other time. I told you it had come up short, and I didn't deduct anything from you, man. The other time there was some missing, man.

> Quintanilla:  Let's see if I can replace some of what was missing . . . but, no man, I checked them . . . and they don't have a way of getting into it.

> Ceballos: Yeah. No, no and if not . . . nah, what do they want it for?

Quintanilla: I'm going to double check it this time, man.

Ceballos: Yeah, if you give me . . . so I don't deduct any more. Add something, man.

Quintanilla: Alright. Anyway, I'll give you some back with the other one, man.

Agent Kress testified that in his opinion, Ceballos' use of the word "both" in his statement, "there was some missing from both" meant that Ceballos was expecting a two-pound shipment of methamphetamine, and that he had received less than this amount. Agent Kress went on to testify that the use of "it" and "them" throughout the rest of the conversation referred to shipments of methamphetamine that Quintanilla had prepared and packaged in Texas and had sent to Ceballos in Indiana. He based this opinion, in part, on the fact that there were no other nouns to which the pronouns "it" and "them" referred and therefore the pronouns were ambiguous.

In *Rollins*, a DEA agent testified about his interpretation of intercepted phone conversations between two alleged drug dealers. *See id.* In several instances, the drug dealers used the word "it" and other words, which the agent testified referred to cocaine. *See id.* We held that the use of the word "it" constituted drug code language in that case and as such was the proper subject of expert testimony. *See id.* Here, as in *Rollins*, we hold that the district court did not abuse its discretion in permitting Agent Kress and Agent Styron to offer expert testimony on the meaning of pronouns such as "it" and "them" because the pronouns were used in an ambiguous manner and because of the agents' vast experience with drug code language. Further, this testimony was helpful to the jurors because "[a]s a result of [the agents' expert] testimony, the jury was able to apply to the evidence alternative theories of which they ordinarily would not have been aware." *United States v. Sanchez-Galvez*, 33 F.3d 829, 832 (7th Cir. 1994). Finally, our

conclusion regarding the admissibility of the agents' testimony is bolstered by the holding in *Nersesian*, whereby the court affirmed the district court's acceptance of a DEA agent's testimony that "the excessive use of pronouns" signaled a drug-related conversation. *See* 824 F.2d at 1307-08.

### 3. *Apprendi*

The defendants' next argument is that their sentences should be reversed because § 841 unconstitutionally treats drug quantity as a sentencing factor, rather than as an element of the offense, in violation of the Fifth and Fourteenth Amendments as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). We rejected an identical argument in *United States v. Brough*, 243 F.3d 1078, 1079-80 (7th Cir.), *cert. denied*, ___ U.S. ___, 122 S. Ct. 203, 151 L. Ed. 2d 144 (2001) and held that the sentencing provisions of § 841 were constitutional and we decline the defendants' invitation to reconsider our position on that issue.

### B. *Deneise Quintanilla*

### 1. *Admission of Evidence*

Deneise's first argument is that the district court erred in admitting the transcripts of three intercepted phone conversations—Exhibits 154, 194, and 195. The district court admitted Exhibit 154 as an admission of a party-opponent under Federal Rule of Evidence 801(d)(2)(A) and admitted Exhibits 194 and 195, which involved the sale of methamphetamine in Texas, as statements in the furtherance of a conspiracy under Federal Rule of Evidence 802(d)(2)(E). We review the district court's admission of this evidence for an abuse of discretion. *See United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002).

Deneise does not quarrel with the district court's findings that Exhibits 154, 194, and 195 complied with the requirements for admissibility under the rules of evidence. Rather, she argues that these exhibits concerned a different conspiracy than the one charged in the indictment and therefore contends that she was prejudiced by their admission because evidence of one conspiracy cannot be admitted as evidence of a separate conspiracy. In order to succeed on this claim, Deneise must show that the evidence presented at trial was insufficient to support a finding of a single conspiracy and that she was prejudiced by the exhibits' admission. *See United States v. Jones*, 275 F.3d 648, 651 (7th Cir. 2001). To determine whether a single conspiracy or multiple conspiracies existed, we look at the nature and purpose of the defendants' agreement. *United States v. Mezzanti*, 888 F.2d 1165, 1174 (7th Cir. 1988). Multiple conspiracies exist when there are separate agreements to effectuate distinct purposes. *See United States v. Thorton*, 197 F.3d 241, 254 (7th Cir. 1999). A single conspiracy exists, on the other hand, when the evidence, viewed in the light most favorable to the government, establishes that the co-conspirators joined to effectuate a common design or purpose. *See Mezzanti*, 888 F.2d at 1174; *see also Thorton*, 197 F.3d at 254 (finding single conspiracy where all of defendant's activities with his co-conspirators had "one purpose—the distribution of crack and cocaine").

In *Jones*, the indictment charged a single conspiracy, and much of the government's evidence at trial concerned the defendant's activities with three individuals, whereby the conspirators would travel to Chicago, purchase crack, and return to Springfield to distribute the crack there. *See* 275 F.3d at 650-53. The government also introduced the testimony of Tonya Gephardt, who testified that she traveled with the defendant to Chicago, purchased crack, and returned to Springfield to sell the crack. *See id.* at 650. On appeal, the defendant argued that his initial three co-conspirators had been arrested before the activities about

which Gephardt had testified and therefore there were two separate conspiracies—one prior to the co-conspirators' arrest and one after their arrest that involved Gephardt. *See id.* at 651-52. The defendant asserted that the indictment only charged the former conspiracy and therefore Gephardt's testimony was inadmissible. *See id.* We noted that the indictment against the defendant alleged that he conspired with "others" to distribute crack and held that a single conspiracy existed because the activity about which Gephardt testified had the same design and purpose as the defendant's activities with his initial three co-conspirators. *See id.* at 652-53. Therefore, we held that the district court did not err in admitting Gephardt's testimony. *See id.* at 653.

In the present case, Deneise argues that the indictment charged a conspiracy to distribute methamphetamine in southern Indiana and that the disputed exhibits, which regarded the ultimate distribution of methamphetamine in Texas, concerned a separate conspiracy and were therefore inadmissible. However, the indictment shows that the government charged Deneise with a conspiracy to distribute methamphetamine "in the Southern District of Indiana, Evansville Division, *and elsewhere*." (Emphasis added). To that end, the evidence at trial, viewed in the light most favorable to the government, established Deneise's involvement in the following conspiracy: Miguel obtained methamphetamine from an individual named Leonel Moreno and along with Deneise packaged the methamphetamine and sold it to people who would either distribute it on the street level in Texas or would take it to Indiana for further distribution. The Quintanillas would use couriers in Texas to take the methamphetamine to Ceballos and others in Indiana. For example, Terri Nichols testified that on one occasion, she went to the Quintanillas's house, saw Deneise packing methamphetamine in plastic wrap, purchased that methamphetamine from the Quintanillas, and took it to Indiana for further distribution. The disputed exhibits, on

the other hand, concerned the part of the conspiracy whereby the Quintanillas would distribute methamphetamine in Texas. Because the activities described in Exhibits 154, 194, and 195 pertain to Deneise's involvement in the distribution of methamphetamine obtained from Moreno, they concern the same conspiracy that was charged in the indictment and that was shown by the government's other evidence at trial. As in *Jones*, we hold that there was only a single conspiracy in this case and that the district court did not err in admitting Exhibits 154, 194, and 195.[2]

### 2. Sentence Enhancement

Deneise next contends that the government's § 851(a) information was improperly served and therefore her sentence should not have been enhanced. Section 851(a)(1) provides:

> No person . . . shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon.

In this case, the government filed its § 851(a) information on June 11, three days before trial. On June 12, during a pre-trial conference, the government also told Deneise's counsel that it had filed the information and had mailed a

---

[2] The admission of Miguel's statements in Exhibits 194 and 195 also does not violate the Confrontation Clause of the Sixth Amendment, which does not apply to statements admitted under Rule 801(d)(2)(E). *See United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995). Further, our finding that a single conspiracy existed also disposes of Deneise's argument that the district court erred in not giving a multiple-conspiracy instruction to the jury.

copy of the information to his office the previous day. However, Deneise's counsel did not receive the § 851(a) information until June 16, two days after trial had commenced. After the jury returned a guilty verdict against Deneise, the district court sentenced her to life imprisonment pursuant to § 851. On appeal, Deneise argues that the district court did not have jurisdiction to impose the enhanced sentence due to her prior convictions because the government failed to satisfy the procedural requirements of § 851(a). She argues that because § 851(a) is jurisdictional, the government must have actually delivered, and not just mailed, the information to her or her counsel before trial.

As an initial matter, some circuits, including ours, have previously called § 851(a)'s notice requirements "jurisdictional." *See, e.g., United States v. Lawuary*, 211 F.3d 372, 376 n.6 (7th Cir. 2001); *Harris v. United States*, 149 F.3d 1304, 1306 (11th Cir. 1998); *United States v. Hill*, 142 F.3d 305, 312 (6th Cir. 1998); *United States v. Wright*, 932 F.2d 868, 882 (10th Cir. 1991). However, this assertion is generally made in passing and without analysis. For example, in *United States v. Belanger*, 970 F.2d 416, 418 (7th Cir. 1992), the first case from our Circuit holding that § 851(a)'s requirements were jurisdictional, the only comment is that "[f]ailure to file the notice prior to trial deprives the district court of jurisdiction to impose an enhanced sentence." However, this characterization did not affect the outcome of the case because in *Belanger* we held that the government's notice satisfied § 851(a)'s procedural requirements. *See id.* The next case from our Circuit holding that § 851(a) was jurisdictional merely cited *Belanger* for that proposition and did not examine the issue, *see Kelly v. United States*, 29 F.3d 1107, 1110 (7th Cir. 1994), and another case did not cite to any case for the proposition that § 851(a) was jurisdictional. *See United States v. Jackson*, 189 F.3d 655, 661 (7th Cir. 1999), *overruled on other grounds by United States v. Buford*, 201 F.3d 937, 942 (7th Cir. 2000). Finally, the only other Seventh Circuit case on point merely cites

*Jackson*. *See Lawuary*, 211 F.3d at 376 n.6. Moreover, none of the authority upon which our initial case, *Belanger*, relies offers any explanation for why § 851(a)'s requirements should be jurisdictional. *See, e.g., Wright*, 932 F.2d at 882; *United States v. Cevallos*, 538 F.2d 1122, 1125-26 (5th Cir. 1976).[3]

On the other hand, all of the courts that have offered analysis on the issue have held that § 851(a)'s notice requirements are not jurisdictional. *See, e.g., United States v. Mooring,* 287 F.3d 725, 727-28 (8th Cir. 2002); *Prou v. United States,* 199 F.3d 37, 45-46 (1st Cir. 1999); *see also United States v. Baucum*, 80 F.3d 539, 543-44 (D.C. Cir. 1996) (holding that similar provisions under 21 U.S.C. § 860(a) were not jurisdictional). In other words, *Mooring* and *Prou* hold that the government's failure to satisfy the requirements of § 851(a) deprives the district court of authority, but not subject-matter jurisdiction, to impose an enhanced sentence due to prior convictions. *See* 287 F.3d at 727-28; 199 F.3d at 45. In addition, one of our colleagues has offered his view that § 851(a) merely sets a "condition precedent" to the imposition of an enhanced sentence and that § 851(a) is not jurisdictional. *See Lawuary*, 211 F.3d at 378-80 (Easterbrook, J., concurring).

We must, of course, address subject-matter jurisdiction in every case. Given the existing circuit split on the issue and

---

[3] In fact, *Cevallos* only says:

> Assuming that a failure by the Government strictly to comply with s 851(a)(1)'s requirement of service of the information of a previous conviction does deprive the District Court of jurisdiction to impose an enhanced sentence . . . the uncontroverted evidence more than supports the District Judge's implied finding that petitioner's counsel was in fact served with a copy of the information of previous conviction prior to the guilty plea proceeding and petitioner was so advised by his counsel.

our lack of analysis in previous decisions, we believe it appropriate to reexamine our position that § 851(a) is jurisdictional. In doing so, to the extent that there is Seventh Circuit precedent holding that § 851(a) is jurisdictional, we note that "drive-by jurisdictional rulings . . . have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).

We start by noting that jurisdictional problems generally fall into two broad categories. *See Lawuary*, 211 F.3d at 378 (Easterbrook, J., concurring). The first concerns the constitutional or statutory limits placed upon the adjudicatory authority of federal district courts. *See id.* In this case, the district court clearly had subject-matter jurisdiction over Deneise's prosecution pursuant to 18 U.S.C. § 3231, which confers jurisdiction "of all offenses against the laws of the United States." *See Prou*, 199 F.3d at 45. Accordingly, "[o]nce subject-matter jurisdiction has properly attached, courts may exceed their authority or otherwise err without loss of jurisdiction." *Id.*; *see also Blackledge v. Perry*, 417 U.S. 21, 30, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974). The present case clearly illustrates this principle: even if the government's service of the information did not satisfy § 851(a), and thus the district court erred in imposing an enhanced sentence, this error did not affect the district court's subject-matter jurisdiction, which had been properly obtained pursuant to § 3231. *See Prou*, 199 F.3d at 45; *Baucum*, 80 F.3d at 543-44. Thus, the only question that arises from the government's § 851(a) information "concerns the court's authority to impose an enhanced sentence . . . [and] is simply not a question of subject-matter jurisdiction." *Prou*, 199 F.3d at 45.

The second category of jurisdictional problems "includes rules that cannot be waived by the parties, and which are loosely called 'jurisdictional' because they have this feature in common with the genuine jurisdictional limits." *Lawuary*, 211 F.3d at 379 (Easterbrook, J., concurring).

However, that § 851(a) is an unqualified right ("[No] person . . . *shall*") does not distinguish it from other unqualified entitlements that defendants possess and can waive, and consequently are not jurisdictional. *See id.* (stating that defendants may waive indictment despite the Fifth Amendment's unqualified language); *see also New York v. Hill*, 528 U.S. 110, 114-16, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000) (Interstate Agreement on Detainers, which contains unqualified language concerning when a defendant transferred to another state shall be brought to trial, does not preclude waiver and forfeiture); *United States v. Mezzanatto*, 513 U.S. 196, 200-04, 115 S. Ct. 797, 130 L. Ed. 2d 697 (1995) (holding that defendant may waive right against self-incrimination from statements made during plea negotiations).

This second category of jurisdictional problems reflects the "chameleon-like quality of the term 'jurisdiction'" and the fact that judges and legislators sometimes use the term jurisdiction to erroneously refer to a court's authority to issue a specific type of remedy, rather than to the court's subject-matter jurisdiction. *Prou*, 199 F.3d at 45. For example, in *Steel Co.*, the Supreme Court held that 42 U.S.C. § 11046(c), which provided that the "district court shall have jurisdiction" to impose a civil remedy in certain situations, did not affect subject-matter jurisdiction. *See* 523 U.S. at 89-93. Rather, the Court held that § 11046(c) should be read as merely affecting courts' remedial power to enforce violations of that statute by imposing civil penalties. *See id.*

The Supreme Court's recent opinion in *United States v. Cotton*, ___ U.S. ___, 122 S. Ct. 1781 (2002) is also illustrative. There, the Court overruled *Ex Parte Bain*, 121 U.S. 1 (1887), which had held that defects in the indictment were jurisdictional. *See Cotton*, 122 S. Ct. at 1785. The *Cotton* Court stated that the desire to correct constitutional errors "led to a somewhat expansive notion of jurisdiction," and that *Bain*'s concept of jurisdiction was not what that term

means today—"the courts' statutory or constitutional *power* to adjudicate the case." *Id.* at 1784-85 (quotations omitted) (emphasis added). Therefore, the Court overruled *Bain* and held that defects in the indictment do not deprive a court of jurisdiction. *See id.* at 1785.

Section 851(a) affects the length of sentences and, similar to the statute at issue in *Steel Co.*, § 851(a), merely affects district courts' power to impose penalties after substantive violations have occurred. Therefore, § 851(a) has nothing to do with subject-matter jurisdiction, as the Supreme Court has defined that term in *Cotton*. In sum, today we hold that § 851(a)'s procedural requirements are not jurisdictional, and our prior cases holding otherwise are expressly over-ruled on that issue.[4]

We now turn to the question of whether the government's service of its information satisfied § 851(a) in this case. Section 851(a) requires the government to serve its information before trial. Federal Rule of Criminal Procedure 49(b) governs the service of papers in criminal cases and states that "[s]ervice upon the attorney or upon a party shall be made in the manner provided in civil actions." The relevant civil rule, Federal Rule of Civil Procedure 5(b), provides that "[s]ervice . . . is made by . . . [m]ailing a copy to the last known address of the person served" and that "[s]ervice by mail is complete on mailing." In *United States v. Novaton*, 271 F.3d 968, 1015 (11th Cir. 2001), the government filed a § 851(a) information the day before trial commenced and mailed a copy of it to the defendant's counsel that same day. The court noted that Federal Rule of Criminal Procedure 49(e) and Federal Rule of Civil Procedure 5(b) applied and accordingly held that because the government mailed the

---

[4]  This opinion was circulated among all judges of this court in regular active service pursuant to Circuit Rule 40(e). No judge favored a rehearing en banc on the question of the jurisdictional nature of § 851(a).

information the day before trial, the "service of the government's § 851 notice in this case was completed the day before trial began, in conformance with the procedural requirements of 21 U.S.C. § 851(a)(1)." *Id.* at 1016.[5] Likewise in our case, the government's § 851(a) information was served two days before trial when the government mailed it to defense counsel, and thus the government satisfied the requirements of § 851(a). *See id.*; *see also United States v. White*, 980 F.2d 836, 840 n.8 (2d Cir. 1992) (holding that service of § 851 information is complete upon mailing).

Moreover, the government advised Deneise's counsel before trial that it would seek an enhanced sentence due to Deneise's prior convictions if she rejected its plea offer. Further, the government identified the specific convictions upon which it would rely for the enhancement at that same time. After Deneise rejected the plea three days before trial, the government filed its § 851(a) information and mailed a copy to defense counsel. In addition, during a pretrial conference two days before trial, the government told defense counsel that it had filed the information the preceding day and had mailed a copy to him. In her appellate brief, Deneise conceded that her attorney communicated this information to her before trial. Thus, Deneise had actual knowledge of the enhancement before trial, which supports our conclusion that the district court properly enhanced Deneise's sentence. *See United States v. Tringali*, 71 F.3d 1375, 1382 (7th Cir. 1995) ("[Defendant] received *actual* notice of the government's intent to seek enhanced

---

[5] The court in that case also stated that service of a § 851(a) information before trial was a jurisdictional requirement. *See id.* at 1015. However, this characterization did not affect the outcome of that case because the court found that the government had satisfied § 851(a). *See id.* at 1016. Thus, that court's jurisdictional characterization, which conflicts with our holding today that § 851(a) is not jurisdictional, is irrelevant to the analysis of whether the government satisfied § 851(a).

penalties against him. That is more than sufficient for purposes of section 851.") (emphasis in original); *United States v. Brown*, 921 F.2d 1304, 1308-09 (D.C. Cir. 1990) (holding that § 851(a)'s requirements were satisfied due to defendant's actual notice even though the information was filed after trial had commenced); *United States v. Weaver*, 905 F.2d 1466, 1481 (11th Cir. 1990) (holding that oral notification and timely service satisfied § 851(a)'s requirements even though information was not filed until after trial had begun). Thus, in sum, because the government mailed its information to defense counsel before trial and because Deneise had actual notice of the enhancement prior to trial, we hold that the district court did not err in imposing an enhanced sentence.

## *C. Alfredo Ceballos*

Before trial, Ceballos moved to suppress his oral confession, arguing that it was not voluntary. At the suppression hearing, the following facts were adduced: DEA agents arrested Ceballos and his wife Lisa Ceballos at their home pursuant to a search warrant. Major Dennis Holt of the Vincennes Police Department and DEA Task Force then took Ceballos into the bedroom, while his wife and the remaining agents stayed in the living room. Major Holt read Ceballos his *Miranda* rights in English, and Ceballos indicated that he understood and could speak English and that he wanted to give a statement.[6] Major Holt falsely informed Ceballos that the DEA had arrested Miguel Quintanilla in Dallas and that he had implicated Ceballos in several drug transactions, and Ceballos then spoke with

---

[6] Major Holt testified that he believed that Ceballos could speak English because he had heard Ceballos speaking English during one of the intercepted phone conversations and because he was married to a woman whose only language was English.

Major Holt for approximately forty-five minutes, answering a series of questions. Major Holt testified that Ceballos spoke in English throughout the interview, albeit mostly in broken sentences. Nevertheless, he stated that Ceballos could speak English well and could understand the questions posed to him. After the interview with Major Holt, Officer Neftali Padilla read Ceballos his *Miranda* rights in Spanish. Ceballos again indicated that he understood his rights and that he wanted to talk to the police. Shortly thereafter, Ceballos was taken to a police station in Evansville, Indiana, where Agent Kress read him his *Miranda* rights in English. For a third time, Ceballos indicated that he understood his rights and he then spoke with Agent Kress for about thirty to forty-five minutes.

Ceballos moved to suppress his two statements, arguing that they were not voluntary, but the district court denied Ceballos's motion and admitted his statements into evidence. We review the voluntariness of a confession *de novo*, and in doing so will accept the district court's findings of fact absent clear error. *See United States v. Sablotny*, 21 F.3d 747, 751-52 (7th Cir. 1994). A confession is voluntary if in light of the totality of the circumstances, it was "not secured through psychological and physical intimidation but rather was the product of a rational intellect and a free will." *Id.* at 750 (quotations omitted). We have previously identified several factors that are relevant to determining voluntariness of a confession, including but not limited to whether the defendant was read his *Miranda* rights, the defendant's age, the duration and nature of the questioning, and whether the defendant was punished physically. *See id.*

In this case, the totality of the circumstances militates in favor of the conclusion that Ceballos' confession was voluntary. He was read his *Miranda* rights three times, in both English and Spanish. In each instance, he indicated that he understood his rights but still wished to give a statement. In addition, he was twenty-four years old and

there is no evidence that he had a diminished mental capacity. *See Wiedner v. Thieret*, 932 F.2d 626, 627-28 (7th Cir. 1991) (finding that a confession made by a seventeen-year-old defendant who claimed to suffer brain damage due to drug abuse was voluntary). Further, the duration of his questioning was relatively short (two forty-five-minute periods of questioning). *See United States v. Cichon*, 48 F.3d 269, 271, 276 (7th Cir. 1995) (holding confession voluntary where defendant was questioned for two hours). Finally, there was no evidence that he was punished physically.

Further, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). To that end, Ceballos focuses on Major Holt's false comment that Miguel Quintanilla had already implicated Ceballos, which he argues overbore his will and constituted impermissible coercion.[7] However, we allow "considerable latitude in playing on the guilt and fears of the person interrogated in order to extract a confession that he will shortly regret having given." *Johnson v. Trigg*, 28 F.3d 639, 641 (7th Cir. 1994). In fact, we have held that a law-enforcement agent may "actively mislead" a defendant in order to obtain a confession, so long as a rational decision remains possible. *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990). In *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992), the defendant confessed shortly after a police officer had lied to him that a witness had seen the defendant in the alley in which the victim had been raped. We held that this statement, without more, did not render the defendant's confession involuntary, stating that "[o]f

---

[7] Ceballos also complains about Major Holt's statement that Ceballos might lose custody of his children if his wife remained incarcerated. However, this statement occurred *after* Ceballos had given his two statements, and therefore did not constitute psychological intimidation that coerced Ceballos into confessing.

the numerous varieties of police trickery . . . a lie that relates to the suspect's connection to the crime is the least likely to render a confession involuntary." *Id.* As in *Holland*, Major Holt's lie related to Ceballos's connection to the crime, and we have no problem concluding that this comment, in light of the totality of the circumstances, did not render Ceballos's confession involuntary. *See id.*; *see also United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) (false statement that witness had seen him with a gun was not coercive); *Lucero v. Kirby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (lie regarding fingerprint evidence).

## D. *Miguel Quintanilla*

### 1. *Motion to Dismiss*

On the day trial commenced, Miguel filed a motion to dismiss due to an alleged Sixth Amendment violation based on the performance of his initial attorney, Scott Danks. The district court ultimately denied Miguel's motion to dismiss, which we review for an abuse of discretion. *See United States v. Alanis*, 265 F.3d 576, 584 (7th Cir. 2001). Danks was appointed as Miguel's counsel on September 26, 2000, and continued to represent him until his motion to withdraw was granted on April 12, 2001. During his representation, Danks assisted Miguel in waiving his initial appearance and entering a plea of not guilty. Otherwise, however, Danks did not communicate with his client nor file any motions on his behalf. The same day that the district court granted Danks's motion to withdraw, it also appointed Beverley Corn to represent Miguel. Corn represented Miguel throughout the remainder of the pre-trial proceedings, during trial, and continues to represent him on appeal. Corn filed numerous motions on his behalf, including several motions in limine to exclude the expert testimony of Agents Kress and Styron, a motion in limine to exclude one intercepted phone conversation with Miguel's daughter, motions to suppress the evidence obtained from the Indiana and

Texas wiretaps, and the motion to dismiss on the day of trial.[8] Further, at trial, Corn cross-examined many government witnesses and made closing arguments.

For Miguel to prevail on his claim, he must establish that Danks's performance was deficient and that the deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[9] A failure to establish either prong would result in a denial of Miguel's claim. *See Rastafari v. Anderson*, 278 F.3d 673, 688 (7th Cir. 2001). The government agrees with Miguel that Danks rendered deficient performance, but argues that he has not established that this deficiency prejudiced him. To establish prejudice, Miguel must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability involves a probability sufficient to undermine the confidence in the outcome of the case. *See id.*

In *United States v. Goudy*, 792 F.2d 664, 671-72 (7th Cir. 1986), the defendant claimed that his counsel was ineffective for, among other things, failing to communicate with

---

[8] The district court granted the motion in limine regarding the conversation with Miguel's daughter, but denied the other motions.

[9] Miguel argues that he need not establish prejudice because Danks was "totally absent from his case," and the Supreme Court has held that a defendant can establish a "constitutional error without any showing of prejudice when counsel was . . . totally absent . . . during a critical stage of the proceedings." *United States v. Cronic*, 466 U.S. 648, 659 n.25, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) (plurality). However, Miguel does not identify any critical stage of the proceedings at which he was without representation, and indeed the record reveals none. Therefore, *Cronic* does not apply to Miguel's case, and he must establish prejudice to prevail on his claim. *See Strickland*, 466 U.S. at 687.

him for two and one-half months preceding trial and for failing to file any pre-trial motions. We held that the defendant's claim failed because he did not "suggest in any way how the outcome of the trial would have differed if some unspecified motions had been filed or if his attorney had met with him some unspecified number of times before trial." *Id.* at 672; *see also United States v. Olson*, 846 F.2d 1103, 1108 (7th Cir. 1988) (rejecting defendant's ineffective assistance of counsel claim based on attorney's inadequate pre-trial contact because defendant "failed to affirmatively show prejudice"). In this case, Miguel has not suggested that Danks's performance prejudiced him, and thus, as in *Goudy* and *Olson*, his claim must fail.

### 2. *Enhanced Sentence*

At the time of Miguel's conviction, he had three prior felony drug convictions. Before trial, the government filed a timely information pursuant to § 851 based upon these convictions, and accordingly, at sentencing, the district court found that Miguel faced a mandatory sentence of life imprisonment due to the drug quantity and his prior felony convictions. On appeal, Miguel contends that based on *Apprendi*, 530 U.S. at 490, the district court erred in sentencing him to life imprisonment without submitting the fact of his three prior felony convictions to a jury. However, *Apprendi* specifically exempts prior convictions from facts that the government must prove to a jury beyond a reasonable doubt. *See id.*; *see also Brough*, 243 F.3d at 1081 (holding that "penalty enhancements based on recidivism need not be established beyond a reasonably doubt"). Therefore, Miguel's claim must fail.

### E. *Cross-Appeal*

The government cross-appeals the district court's refusal to enhance Ceballos's and Martinez-Guzman's sentences

pursuant to Sentencing Guideline § 3B1.4, which provides for a two-level increase if the defendant used a person less than eighteen years of age to commit the offense. In this case, the district court found that Ceballos and Martinez-Guzman used Jorge Hernandez-Martinez, a person less than eighteen years of age, to commit an offense. However, the district court also found that § 3B1.4 did not apply because neither Ceballos nor Martinez-Guzman used Hernandez-Martinez to shield themselves from prosecution and accordingly did not enhance their sentences pursuant to that Guideline.[10] We review the district court's interpretation of the Sentencing Guidelines *de novo. See United States v. Mayberry*, 272 F.3d 945, 948 (7th Cir. 2001).

We begin by noting that the plain language of § 3B1.4 states that "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense . . . increase by 2 levels." The Application Notes to § 3B1.4 further state that using a minor includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting" the minor. In this case, the district found that Ceballos and Martinez-Guzman used a minor by "directing" Hernandez-Martinez's actions. For example, during controlled purchases with undercover DEA agents, Ceballos and Martinez-Guzman told Hernandez-Martinez to quote certain prices to the agents. Ceballos and Martinez-Guzman do not argue that Hernandez-Martinez's involvement did not constitute "use" under § 3B1.4, as indeed they cannot. *See, e.g., United States v. Vivit*, 214 F.3d 908, 920 (7th Cir. 1999) (holding

---

[10] Specifically, the district court stated that "this particular adjustment is addressed to an individual who has a minor commit a crime or substantially participate in the role in a crime to shield the adult from prosecution because of the fact that the juvenile will not be prosecuted to the extent that an adult will be prosecuted."

that § 3B1.4 applied when the defendant told a minor to fraudulently sign an attendance sheet). Therefore, the district court correctly found that Ceballos and Martinez-Guzman used a minor and accordingly should have enhanced their sentences.

The district court, however, found that § 3B1.4 contains an additional requirement that the defendants must have intended to shield themselves from prosecution. The plain language of § 3B1.4 does not support this interpretation, and absent a clear manifestation of contrary intent, we give effect to the plain language of the Sentencing Guidelines. *See United States v. McClain*, 252 F.3d 1279, 1285 (11th Cir. 2001). Moreover, the district court's interpretation of § 3B1.4 requires a finding that the defendant had actual knowledge that the person he used to commit the offense was a minor, and two other courts have held that § 3B1.4 does not require such actual knowledge. *See United States v. Gonzalez*, 262 F.3d 867, 870 (9th Cir. 2001) ("We decline [the defendant's] invitation to read a scienter requirement into section 3B1.4 because the plain language of the guideline does not require that a defendant have knowledge that the individual is under eighteen years of age for the enhancement to apply."); *McClain*, 252 F.3d at 1286. In *McClain*, the court also stated that requiring the government to prove scienter would frustrate the purpose of § 3B1.4, which is to protect minors from being used to commit crimes. *See* 252 F.3d at 1286.

We have never ruled on the precise issue at hand—whether the government must prove that the defendant intended to use the minor to shield himself from prosecution in order to invoke § 3B1.4. However, several decisions are instructive. For example, in *United States v. Smith*, 223 F.3d 554, 566 (7th Cir. 2000), we addressed 21 U.S.C. § 861(a)(1), which makes it unlawful to use a person under the age of eighteen to violate any provision of the Controlled Substance Act. We held that § 861(a)(1) does not require

the government to establish that the defendant knew the minor's age to support a conviction. *See id.* In reaching this decision, we recognized that requiring the government to prove the defendant's knowledge of the minor's age would undermine the legislative purpose behind the statute. *See id.* In addition, in *United States v. Ramsey*, 237 F.3d 853, 859-60 (7th Cir. 2001), we addressed whether the fact that the minor had a substantial role in the offense precluded the application of § 3B1.4. We held that it did not, noting that "[t]o shield defendants from application of this provision simply because the minor that they solicited is given a substantial role in the commission of the offense would be a blow to the purpose of the provision: to discourage defendants from involving minors in the commission of crimes." *Id.* at 860.

Based on the plain language and purpose of § 3B1.4, our prior interpretation of the federal statute addressing the use of minors by drug traffickers, and the Ninth and Eleventh Circuits' interpretation of § 3B1.4, we hold that the government is not required to prove that the defendants intended to use the minor to shield themselves from prosecution in order for § 3B1.4 to apply. Accordingly, the district court erred in not enhancing Ceballos's and Martinez-Guzman's sentences, which we must vacate and remand for re-sentencing.

## III. Conclusion

For the foregoing reasons, we AFFIRM the convictions and sentences of all of the defendants, except for the sentences of Ceballos and Martinez-Guzman, which are VACATED and REMANDED for re-sentencing consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*