**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued December 15, 2004
Decided August 2, 2005

**Before**

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-2826

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* <br><br> v. <br><br> JEFFREY SCOTT WALKER, *Defendant-Appellant.* | Appeal from the United States District Court for the Southern District of Indiana, Terre Haute Division. <br><br> No. 2:03CR00015-015 <br><br> **John D. Tinder**, *Judge.* |

**O R D E R**

Jeffrey Scott Walker was convicted after a jury trial of conspiracy to distribute methamphetamine and possession of methamphetamine with intent to distribute. On appeal, he challenges the denial of his motion to suppress evidence seized from his home under the authority of a federal search warrant. He argues that the affidavit supporting the search warrant did not establish probable cause to believe that contraband or evidence would be found in his home, and that the information about him in the affidavit was stale. We conclude that the affidavit was adequate to support the warrant, and that even if this were questionable, the search satisfied the good-faith exception to the exclusionary rule. We therefore affirm the judgment of the district court.

**I**

On September 18, 2003, a federal magistrate judge issued a warrant to search Walker's home for drugs and evidence of drug trafficking and money laundering. The judge had before him a 104-page affidavit from an agent of the federal Drug Enforcement Administration that described conversations intercepted during the wiretap of a cellular telephone used by Francis Blair, the head of a methamphetamine conspiracy. Authorities conducted their surveillance of Blair's telephone from August 5 through August 31, 2003. During that period, Walker was heard four times talking with Blair about methamphetamine. Telephone calls between Blair and other associates also revealed information suggesting to the DEA agent that Walker was involved in drug trafficking.

Specific affidavit entries relating to Walker began with events on August 13, 2003, when Charles Judy called Blair to report that he had set up a meeting with Walker. Blair replied that he was concerned about Walker's being drunk and getting into "it" with "Mike." Blair told Judy that he wanted Walker to know that he would not tolerate drinking and "taking care of business." The DEA agent interpreted this conversation to mean that Blair did not want Walker dealing in methamphetamine and collecting money while he was drunk. Three days later, Blair placed a call to Michael Covert, informing him that "Scott wants to pay me your money, do you want me to do it?" Covert replied that he would "mark it off." The agent thought that this indicated that Walker was paying Blair money that Walker owed to Covert for drugs.

Ten days later, on August 26, 2003, Judy called Blair and said that he intended to make a "run" for Walker. The DEA agent interpreted this conversation to mean that Judy either planned to deliver methamphetamine to Walker or to collect money from him. Later that same day, Walker telephoned Blair to say that he was waiting for "Charlie." Blair then telephoned Judy to report that Walker was waiting. The agent inferred from this statement that Walker was waiting for Judy either to deliver methamphetamine or to collect money from him.

The last reference in the affidavit to Walker related to August 30 and 31. On the 30th, Walker telephoned Blair looking for Judy, and during the conversation Blair asked Walker if he needed "something." Walker responded that he needed "two." Blair agreed to call Walker around 8:00 that evening. The DEA agent surmised that Blair had wanted to know whether Walker needed methamphetamine, and that Walker had replied that he needed two ounces. Walker, however, did not wait for Blair's call. Instead, shortly before 8:00 p.m., Walker called Blair. Blair assured Walker that he would come and get him "hooked up" in approximately 90 minutes. The agent understood Blair to mean that he would deliver two ounces of methamphetamine to Walker, as the two had discussed earlier. About 30 minutes later, Blair called Judy

and said "put Scott Walker down for two." The agent thought that this statement meant that Blair was fronting two ounces of methamphetamine to Walker and that Blair was informing Judy to record Walker's debt on a drug ledger. Finally, on August 31 Blair telephoned Walker and asked what Walker had for him. Walker answered that he had "them two gone." The DEA agent concluded that Walker had distributed the two ounces of methamphetamine that he and Blair had been discussing the previous day.

A little more than two weeks later, on September 18, the magistrate judge issued the warrant Walker is now challenging. The warrant specified documents, records, firearms, drug paraphernalia, currency, and other evidence associated with drug trafficking activity; it did not mention controlled substances separately. Law enforcement officials executed the warrant the next day. They found and seized 4.2 grams of methamphetamine in a shaving bag, 157.6 grams of methamphetamine in the basement rafters, and various other drug-related items including scales, razor blades, and zip lock bags and ties.

Some time later, a grand jury indicted Walker for conspiracy to possess methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Walker moved to suppress the results of the search, arguing that the affidavit supporting the warrant did not contain any information indicating that he had engaged in any unlawful acts outside of his house, or that it was likely that there was contraband or evidence of unlawful acts inside the house. Thus, he reasoned, the affidavit was insufficient to establish probable cause to search the residence. He also argued that the information in the affidavit about his activities was stale. The district court orally denied the motion. It found that the information in the affidavit showed that Walker had a "comfort level" in dealing with the others in the drug conspiracy, which in turn implied that they had an ongoing relationship. Overall, the court found, the affidavit was adequate to establish probable cause, and even if it fell short, the good-faith exception to the exclusionary rule justified denying the motion. The court also found that the intercepted telephone conversations described in the affidavit reflected an ongoing drug-distribution relationship between Walker and Blair and that the information about Walker was therefore not stale.

## II

On appeal, Walker renews his argument that probable cause to search his house did not exist, because the information in the affidavit was too general, and any belief that contraband or evidence would be found in his home was speculation or "mere suspicion." Walker also continues to claim that the information in the affidavit was stale, because 18 days had passed between the last event giving rise to probable cause

and the issuance of the warrant. We review the district court's decision that probable cause existed *de novo. United States v. Fleischli,* 305 F.3d 643, 650 (7th Cir. 2002). Probable cause exists when, considering all the circumstances, the affidavit sets forth sufficient facts to cause a reasonably prudent person to believe that a search will uncover contraband or evidence of a crime. *United States v. Peck,* 317 F.3d 754, 756 (7th Cir. 2003); *United States v. Leidner,* 99 F.3d 1423, 1430 (7th Cir. 1996). Because the affidavit provided the only facts on which the magistrate judge relied to issue the warrant, this court must review independently the sufficiency of the affidavit to determine whether it establishes probable cause. *United States v. Spry,* 190 F.3d 829, 835 (7th Cir. 1999). Nevertheless, the issuing judge's view of the facts is entitled to some deference. *United States v. Koerth,* 312 F.3d 862, 866-67 (7th Cir. 2002).

A. *Probable Cause*

We are satisfied that the affidavit shows that Walker had an ongoing working relationship with Blair by at least August 13, 2003. Fairly read, it establishes that Blair was providing Walker with methamphetamine and that Walker was selling the drugs and delivering the proceeds to Blair. What is missing from the affidavit is any information indicating that Walker used his home to support this activity. The DEA agent's assertion that drugs or evidence of drug dealing was likely to be found in Walker's home rested solely on what the agent knew from training and experience, namely, that "drug traffickers generally store their drug-related paraphernalia in their residences."

The question is whether the agent's general knowledge about the habits of drug dealers in this respect, coupled with evidence of Walker's participation in the methamphetamine conspiracy, was sufficient to create probable cause to search Walker's residence. We have found in the past that general participation in a drug trafficking scheme may be enough to create probable cause to search a participant's home, even without direct evidence that drug-related activity was occurring there, because "evidence is likely to be found where the dealers live." *United States v. Lamon,* 930 F.2d 1183, 1188 (7th Cir. 1991) (quoting *United States v. Angulo-Lopez,* 791 F.2d 1394, 1399 (9th Cir. 1986)). In *Lamon,* despite the informant's statements that the suspect did not sell drugs out of his primary residence, the court upheld the search of that residence based on "considerable evidence" that the suspect was dealing drugs out of his car and another house, along with the detective's statement that drug dealers often hide money, drugs, and other incriminating evidence at their permanent residences. *Id.* at 1190. Similarly, in *United States v. Feliz,* 182 F.3d 82 (1st Cir. 1999), the court overturned the district court's determination of no probable cause to search the suspect's home, where substantial information had been presented that the suspect was engaged in illegal drug trafficking and no other drug-dealing headquarters was identified in the affidavit. *Id.* at 87-88. The court reasoned that probable cause to

search a home in drug cases often will rest not on direct observation, but rather "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide" evidence of the crime in question. *Id.* at 88 (quoting *United States v. Charest,* 602 F.2d 1015, 1017 (1st Cir. 1979)).

We do not read either *Lamon* or *Feliz* as holding flatly that there is always probable cause to search a drug dealer's home, merely because there is probable cause to believe that he or she is engaged in drug trafficking. The facts of a particular case may indicate, for example, that the dealer uses a "safe house" or another participant's property for all of his drug-related business, perhaps to keep information about his activities from others in the home. As usual, the inquiry is highly fact-specific. In Walker's case, however, there was no hint of any other location where Walker would keep materials related to his methamphetamine dealings, and it was logical to infer that such materials existed. On this record, while we regard the information tending to show that evidence might be located within the residence as close to the edge, we think that there was enough to support this warrant.

B. *Staleness*

We have little to say about Walker's staleness argument, other than that it has no merit. The age of inculpatory information is only one relevant factor, *Spry*, 190 F.3d at 836, and this information was not very old. Only 18 days had passed between the last of the telephone intercepts and the issuance of the warrant, under circumstances where the conversations suggested that Walker and Blair had an ongoing relationship. Nothing in the intercepted conversations suggested that this relationship was ending. This court held that seven-month-old information was not stale, in *United States v. McNeese,* 901 F.2d 585, 597 (7th Cir. 1990), overruled on other grounds by *United States v. Westmoreland,* 240 F.3d 618 (7th Cir. 2001). The kinds of items the warrant specified – documents, records, firearms, drug paraphernalia, and currency – are not so evanescent that they would have vanished over less than three weeks.

C. *Good-Faith Exception*

Even if we were to conclude that the information in the affidavit just misses being enough to demonstrate probable cause that evidence would be found in Walker's residence, suppression would be appropriate only if the good-faith exception to the exclusionary rule first recognized in *United States v. Leon*, 468 U.S. 897 (1984), was inapplicable. The good-faith exception does not apply where the issuing magistrate abandons her detached and neutral role, or where the officers seeking the warrant were dishonest or reckless in preparing the affidavit, or where those officers could not have had an objectively reasonable belief in the existence of probable cause. *United*

*States v. Dumes,* 313 F.3d 372, 380-81 (7th Cir. 2002). None of those circumstances obtains here. Moreover, in spite of the fact that the district court specifically mentioned the good-faith exception as an alternate ground for its ruling, Walker has not challenged that ruling on appeal.

We therefore **A**FFIRM the judgment of the district court.